## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

PETER MARTIN,

                     Plaintiff,

       -against-

GOOGLE LLC,

                  Defendant.

Case No.: 3:25-cv-00587

**JURY TRIAL DEMANDED**

### COMPLAINT

The plaintiff, PETER MARTIN ("Plaintiff"), by and through his attorneys, Joseph & Norinsberg, LLC and Zipin, Amster & Greenberg, LLC, as and for his Complaint against GOOGLE LLC ("Defendant"), alleges upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

### NATURE OF THE CASE

1.      This is a civil action for damages and equitable relief based upon willful violations that the Defendant committed of Plaintiff's rights guaranteed to him by: (i)  Section 501 of the Employee Retirement Income Security Act ("ERISA"); (ii) Connecticut's Wage Payment Law, Conn. Gen. Stat. § 31-72 and § 42-482; (iii) fraudulent inducement in violation of Connecticut law; (iv) the breach of contract by failing to pay him his earned commissions; (v) unjust enrichment in violation of Connecticut law; and (vi) any other claim(s) that can be inferred from the facts set forth herein.

## PRELIMINARY STATEMENT

2.      This is a case of egregious discrimination, retaliation, wage theft, and interference with benefits against Plaintiff, a dedicated and high-performing Enterprise Field Sales Representative at Defendant. Despite Plaintiff's exceptional performance, including securing a landmark $35 million contract with Otis Elevator, Defendant engaged in a pattern of discriminatory behavior following Plaintiff's Stage 4 colon cancer diagnosis.

3.      Defendant's actions included withholding earned commissions, denying recognition and promotional opportunities, reassigning valuable accounts, and ultimately terminating Plaintiff's employment. These actions not only violated the federal and state anti-discrimination laws, but also breached Plaintiff's employment contract and violated Connecticut's Wage Payment Law and the ERISA.

4.      Defendant's conduct starkly contradicts its public image of fairness and inclusivity, revealing a disturbing willingness to abjectly discriminate against employees who are fighting life-threatening illnesses. Defendant's actions, including the withholding of upwards of $2 million in earned commissions and the termination of Plaintiff's employment, resulting in the loss of stock options and a company-issued life insurance policy worth upwards of $3 million in its own right, demonstrate a callous disregard for employee rights and legal protections.

5.      This lawsuit seeks to hold Defendant accountable for its discriminatory practices and to secure just compensation for Plaintiff, who has suffered significant financial losses and emotional distress while battling a life-threatening illness. The case underscores the critical importance of upholding workplace protections for employees with disabilities and sends a clear message that even the most powerful corporations must adhere to anti-discrimination laws.[1]

---

[1] Contemporaneous with the filing of this Complaint, Plaintiff is separately filing a charge of discrimination with the U.S. Equal Employment Opportunity Commission, and the Connecticut Commission on Human

## JURISDICTION AND VENUE

6.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, as this action arises under 42 U.S.C. § 12101, *et seq*. The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1367 over all claims arising under Connecticut law.

7.      In addition, and in the alternative, jurisdiction of this Court is separately invoked pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and the action arises between Plaintiff - - a citizen of Connecticut - - on the one hand, and Defendant - - a Delaware limited liability company whose lone member is Alphabet Inc., a separate Delaware corporation - - on the other hand

8.      Venue is appropriate in this court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims for relief occurred in this judicial district.

## PARTIES

9.      At all relevant times, Plaintiff worked remotely for Defendant in Connecticut and was an "employee" entitled to the protections as defined by ERISA and Connecticut's Wage Payment Law.

10.      Defendant is a limited liability company organized under the laws of Delaware, with its principal place of business located in California.

11.      At all relevant times herein, Defendant employs fifteen or more "employees," and is thus an "employer" within the meaning of the ERISA, and Connecticut's Wage Payment Law.

---

Rights and Opportunity. Upon issuance of a right to sue from these agencies, Plaintiff will amend this Complaint to include claims under the Americans with Disabilities Act and the Connecticut Fair Employment Practices Act.

## BACKGROUND FACTS

### *Plaintiff's Employment and Defendant's Sales Plan Structure*

12.    Defendant is Google – the multinational subdivision of Alphabet Inc., best known for its internet search engine technology and various cloud-based computing, advertisement, and marketing services.

13.    Plaintiff commenced his employment with Defendant on July 6, 2020, until his unlawful termination on July 31, 2024, as an Enterprise Field Sales Representative, a role that involved managing and expanding Defendant's engagement with strategic accounts.

14.    When Plaintiff was hired by Defendant, he was part of a new and expanding sales team for the Google Cloud division. As such, there was no formal separate or segmented divisions within Google Cloud, with each sales rep potentially selling to existing customers or potential new customers, colloquially known as "Greenfield" clients.

15.    Plaintiff's direct manager, Justin Srb, established the Greenfield "New England" territory, which was the team and territory to which Defendant assigned Plaintiff.

16.    It was well-known and acknowledged, both within Google and generally in the sales field, that "Greenfield" business took a significant amount of time to build-up new business, as landing brand new accounts was a time-intensive and expensive endeavor.

17.    After the first year of Plaintiff's employment, virtually no members of Plaintiff's seven-person team landed any new business.

18.    But Defendant nevertheless still rewarded Mr. Srb by assigning him a $60 million spender account, Priceline.com, to ensure that he would be rewarded and paid despite his and his team's ongoing struggles.

***Defendant Segments its Sales Team while Granting Plaintiff an Exception to Pursue the
Lucrative "Otis Elevator" Account***

19.     In 2023, Defendant formally segmented its Cloud Sales team into "Greenfield" and "Spender" representatives, with "Greenfield" reps selling exclusively to potential new clients, while "Spender" reps serviced and attempted to up-sell to existing Google clients.

20.     Defendant also maintained "hybrid" sales reps, who as their title would suggest, were able to maintain and pursue both "Spender" and "Greenfield" accounts.

21.     Defendant offers different types of sales plans to its sales representatives like Plaintiff - a "Spender" plan, a "Greenfield" plan, or a "Hybrid" plan.

22.     A "Spender" Plan applies to sales representatives who are not responsible or expected to onboard any new clients or customers; they are instead assigned existing accounts, and their job is to grow the revenue and upsell those particular clients with new or additional Defendant services.

23.     A "Greenfield" Plan is the opposite of a Spender Plan; it applies to sales representatives whose job is to land new clients/customers who were not previously doing active business with Defendant.

24.     A "Hybrid Plan" is a sales plan that accounts for both "Spender" accounts (i.e., recurring revenue from existing clients) and "Greenfield" accounts (i.e., net new business accounts for new Defendant clients/customers, signed by a given sales rep).

25.     In 2023, Defendant formally converted Plaintiff to a "Spender" sales plan representative.

26.     At the time of Plaintiff's conversion to a "Spender" plan, he was already multiple years into his pursuit of a new Greenfield account with Otis Elevator.

27.     When converting him to the "Spender" plan, Plaintiff's two supervisors - Arun Parmar and Justin Srb - both expressly authorized an "exception" to Plaintiff's Spender plan role, permitting him to continue to pursue the Otis accounts under the terms of the "Greenfield" sales plan.

### *Defendant's Fraudulent Inducement and Unjust Enrichment*

28.     While unknown to Plaintiff at the time, Defendant's decision to authorize this exception was an *ultra vires* act that was done to fraudulently induce Plaintiff into pouring his efforts into his pursuit of Otis Elevator, knowing full well that they would later refuse to pay him on the deal on the pretextual ground that he was no longer "eligible" to receive a bonus from this account.

29.     More specifically, Defendant presented this "exception" to Plaintiff as an opportunity to continue his years-long pursuit of the Otis account with the express understanding that he would be compensated according to the Greenfield plan's commission structure if successful.

30.     At the time, Plaintiff specifically proposed and requested to Srb that he enter into a formal agreement in writing that would have set forth the terms that would govern any future sale or contract with Otis.

31.     Defendant, through Srb, rejected this request without explanation, and instead allowed and encouraged him to continue to pursue the Otis deal as a "Greenfield" account notwithstanding Plaintiff's "Spender" rep status.

32.     Plaintiff relied on this representation and continued to dedicate substantial time, effort, and resources to securing the Otis deal, which ultimately culminated in a landmark $35,000,000.00 contract in December 2023.

33. Only after Plaintiff successfully closed the Otis deal did Defendant, through Justin Srb, reveal that the "exception" granted to Plaintiff was purportedly limited to allowing him to *sell* the Otis account, but not to be *paid* commissions on it.

34. The initial response from Justin Srb when Plaintiff inquired about his commissions was that Defendant granted him an "exception" from his "Spender" plan to allow him to sell the Otis account, but not to allow him to be paid on the Otis account - an admission that amounts to blatant and abject wage theft in violation of Connecticut law.

35. Defendant knew at the time it granted the "exception" that it had no intention of paying Plaintiff the commissions he would earn under the Greenfield plan for the Otis deal.

36. Defendant intentionally misrepresented the nature and scope of the "exception" to induce Plaintiff to continue pursuing the Otis account, knowing that Plaintiff would not have dedicated his time and effort to securing the deal had he known he would receive no commission.

37. Plaintiff reasonably relied on Defendant's misrepresentation to his detriment, foregoing other opportunities to pursue accounts that would have resulted in commission payments.

38. As a direct result of Defendant's fraudulent inducement, Plaintiff was deprived of approximately $1,000,000.00 upon closing in December 2023, plus an additional minimum of approximately $1,000,000.00 over the five-year life of the deal, for a combined total of at least $2,000,000.00 in owed and earned commissions.

39. Defendant has been unjustly enriched by receiving the full benefit of Plaintiff's work in securing the $35,000,000.00 Otis contract, which was the largest deal in the Eastern region, seventh largest in the Americas, and eleventh largest worldwide for Defendant that year.

40.     While Defendant refused to pay Plaintiff any commission for the Otis deal, Justin Srb and Gia Winters received revenue credit and commissions for the same deal, further demonstrating Defendant's unjust enrichment at Plaintiff's expense.

41.     Defendant's termination of Plaintiff's employment on July 28, 2024, just months after the Otis deal was secured, further prevented Plaintiff from realizing any benefits from the later years of the five-year contract, despite his instrumental role in securing it.

42.     Defendant's posting of a job opening for a "Field Sales Representative, Enterprise, Northeast, Google Cloud - Cambridge" position on July 11, 2024 - the exact same job that Plaintiff held, in the exact same Northeast territory - demonstrates that Defendant intended to retain the benefits of the Otis contract while eliminating its obligation to compensate Plaintiff for his work in securing it.

43.     Defendant has retained and continues to retain the benefits of the Otis contract, valued at $35,000,000.00 over five years, without providing any compensation to Plaintiff for his work in securing it, resulting in Defendant's unjust enrichment at Plaintiff's expense.

### *Plaintiff's Cancer Diagnosis and Continued Dedication to Secure the Otis Deal Results in Unlawful Disability Discrimination*

44.     Apart from their blatant acts of fraud and wage theft, Defendant's decision to refuse to pay Plaintiff his commissions for the Otis contract under the Greenfield sales plan was also an act of bold-faced disability discrimination after Plaintiff was diagnosed with Stage 4 colon cancer in 2023.

45.     That is, over four years, Plaintiff dedicated himself to building and nurturing a relationship with Otis Elevator, personally and single-handedly stewarding a massive deal.

46.     During his pursuit of the Otis deal, on July 20, 2023, Plaintiff was diagnosed with Stage 4 colon cancer.

47. Upon learning of his illness, Plaintiff immediately informed his management, including Justin Srb, Director of Google Cloud's New England Territory, to which Plaintiff was assigned.

48. Despite undergoing rigorous chemotherapy treatments starting in August 2023, Plaintiff remained resolute: he consistently honored all of his professional commitments and never missed a day of work due to his treatment. Plaintiff even scheduled major surgery on March 13, 2024, for which he only took the necessary medical leave.

49. In December 2023, Plaintiff's efforts culminated in a landmark $35,000,000.00 contract with Otis Elevator.

50. Plaintiff's journey to secure the Otis deal was a rigorous three-year endeavor that demanded extensive planning and coordination. The culmination of this effort involved Plaintiff single-handedly planning an "executive summit" event, requested by the Otis CIO, CTO, Executive VP, and CDIO. This all-day event on March 12, 2024, involved high-profile attendees including the CEO of Google Cloud Thomas Kurian, and Matt Renner, the Head of Global Revenue, among others, including management from Defendant's real estate holdings division.

51. During this meeting, three senior Otis Executives - Neil Green, Otis's Executive Vice President and Chief Digital Information Officer; Rina Leonard, Otis's Chief Information Officer; and Ezhil Nanjappan, Otis's Chief Technology Officer - specifically shared their significant satisfaction and appreciation of Plaintiff's efforts, professionalism, and success in managing their account over the past three years. They collectively emphasized that securing the trust and business at Otis is not easy, while ultimately expressing and highlighting the critical and unequalled importance that Plaintiff played in Otis's decision to sign with Defendant.

52.    Federico Garcia Parra, Head of Global Strategic Accounts at Otis, explicitly praised the deal and Plaintiff's critical involvement to Google's leadership, stating that Plaintiff "started the journey" with Mr. Parra "a couple of years ago" and noting how it was "very fulfilling to see the fruits of months and hours of discussions" thanks to "Pete's vision and strategy."

53.    Bizarrely, Mr. Parra's note was conspicuously ignored by Defendant's upper echelon, including Gia Winters, Managing Director of Northeast Region, and Michael Clark, President of North America Sales.

54.    At the same time, however, even Plaintiff's manager, Arun Parmar, expressly congratulated Plaintiff's work on the Otis contract, praising him on December 12, 2023, for "pushing the right buttons to elevate Otis to the next level of its digital transformation journey."

55.    The successful closure of the Otis deal under these challenging personal circumstances would have quintupled Plaintiff's compensation based on Defendant's sales plan.

56.    That is, under the plain terms of Defendant's FY23 Greenfield Plan, Plaintiff's achievement with the $35,000,000.00 Otis deal qualified him for his maximum potential earnings for 2023, which was 500% On Target Variable ("OTV") compensation cap in 2023, calculated at $994,290.00.

57.    In addition, given the five-year length of the contract, the deal separately entitled Plaintiff to an additional approximately $1,000,000.00 over the five-year life of the deal.

### *Defendant's Refusal to Pay Commissions and its Shifting Justifications in Response to Plaintiff's Complaints*

58.    Despite this remarkable achievement, in December 2023, Justin Srb informed Plaintiff that he would receive *zero* commission for the Otis deal.

59.    Meanwhile, Srb and Gia Winters received revenue credit and commissions for the same deal.

60.    Despite Plaintiff's unwavering dedication and substantial contributions, his professional treatment within Defendant took a disheartening turn following his cancer diagnosis.

61.    During his employment, after obtaining the Otis contract, Plaintiff inquired with Defendant as to why he was not receiving his full commissions/bonus for the deal.

62.    The initial response from Justin Srb was that Defendant granted him an "exception" from his "Spender" plan to allow him to sell the Otis account, but not to allow him to be paid on the Otis account.

63.    This decision starkly contrasted with the treatment of his colleague Jessica Hotes, who, in the previous year sold a similarly sized deal while working in the same role as Plaintiff but critically, without any disability or cancer diagnosis, was not only paid generously but also received significant public praise and professional advancement opportunities.

64.    Plaintiff was pointedly excluded from consideration for Defendant's prestigious Presidents Club, Horizon Award, and any promotional opportunities, deviating drastically from Defendant's usual protocol for recognizing and rewarding significant achievements. While Justin Srb and his manager Gia Winters received revenue credit and commissions for booking the Otis deal, Plaintiff's significant contributions were overlooked, and he was paid zero.

65.    Before commencing this action, Plaintiff, through counsel, presented his complaints and allegations to Defendant, through counsel.

66.    Defendant's counsel responded with a series of shifting explanations for Defendant's refusal to pay Plaintiff his earned commissions, and for Defendant's ultimate decision to terminate Plaintiff's employment.

67.     These shifting justifications conflicted with Defendant's real-time explanations given to Plaintiff during his employment, further demonstrating Defendant's true motivation was unlawful while displaying how its stated bases for its decisions were pretext.

### *Plaintiff's Termination and Defendant's Pretextual Justification*

68.     In January 2024, Plaintiff was in the midst of chemotherapy and radiation treatment but voluntarily chose to miss a day of his treatment to attend an in-person sales kickoff meeting in London.

69.     There, despite his physical discomfort from ongoing cancer treatments, Plaintiff attempted to engage with Gia Winters and Michael Clark about the Otis deal. Ms. Winters and Mr. Clark met Plaintiff with extreme indifference, refusing to engage in any discussions with him. They met his introduction with an actual grimace and walked away, disregarding his presence entirely, further exemplifying Defendant's disregard for his contributions and ongoing discrimination.

70.     In early 2024, Plaintiff was informed by his direct manager, Arun Parmar, that his largest spending accounts, Bright Horizons and Bally's, along with his largest net new target account, Xerox—which had a pending $70,000,000.00 opportunity in play—were being reassigned to other representatives on his team. These accounts were replaced with two smaller, non-enterprise accounts, categorized as SMB (Small and Medium Business) and collectively generating less than $200,000.00 in combined annual revenue.

71.     This drastic reduction in account quality and potential revenue was a stark departure from the high-value accounts Plaintiff was accustomed to handling and was perceived as a strategic move to set him up for failure. To worsen the situation, Arun went as far as inquiring why Plaintiff

was still working at Defendant instead of returning to Plaintiff's previous employer, a question never posed to a top performer.

72.    Plaintiff's performance review in January 2024 resulted in a moderate impact rating of 2 out of 5, despite his previous year's rating of 3 out of 5, or "Exceeds Expectations." The review made no reference to the Otis deal closing in 2023. This was particularly discriminatory when compared to Plaintiff's lead engineer, Kevin Fitzpatrick, who was out of work for six months in 2023 on paternity leave, yet who nevertheless still received a 3 out of 5 rating - and with the Otis deal well documented in his review.

73.    Promises of additional stock equity and a pay increase were later rescinded. In contrast, Plaintiff's colleague, Jesse Adelson - someone with no similar achievement and who was not suffering from a disability - received the same rating but was nevertheless awarded more equity and a salary increase, underscoring the inconsistent, unfair, and unlawful application of policies.

74.    On May 29, 2024, Plaintiff was abruptly informed by Justin Srb that his role was "being eliminated" effective July 28, 2024.

75.    Notably, Mr. Srb explicitly stated that the decision had nothing to do with Plaintiff's performance, and that it was instead due to a "reduction in force." This was an outright fabrication.

76.    Plaintiff aggressively pushed back against this unlawful termination, repeatedly emphasizing that his success warranted keeping him on the team, and noting further that he was in the process of attempting to double the Otis contract from $35 million to potentially $70 million.

77.    On July 1, 2024, Defendant issued Plaintiff an email stating that Plaintiff had "been assigned to the territory Northeast 2 ENT Geo [] with the role of Enterprise FSR. Please check your Book of Business [ ] to see the accounts assigned to you."  Based on this communication, Plaintiff believed that Defendant had heeded his request, reversed course, and reinstated Plaintiff.

78.     Over the next two weeks, Plaintiff repeatedly sought clarification from Defendant to confirm whether or not he was still going to be employed, or if he was going to be terminated, with emails continuing through at least July 9, 2024.

79.     A mere two days later, on July 11, 2024, Defendant posted several job openings for a "Field Sales Representative, Enterprise, Northeast, Google Cloud - Cambridge" position - the *exact same job* that Plaintiff held, in the exact same Northeast territory.

80.     This led Plaintiff to believe that in fact he was not terminated, and that he would be continue to work in the "reassigned" job he received via email on July 1, 2024.

81.     In early July, Plaintiff learned from Otis staff that they had met privately with Defendant's leadership to voice their concerns and severe displeasure that Plaintiff would be removed from managing their account, noting that it was his efforts and his efforts alone that led them to sign with Defendant. Defendant claimed that they had nothing to worry about, going so far as to generate automated emails to Plaintiff that made it appear as though he was not being terminated after all.

82.     Defendant reversed course yet again, rescinding the reassignment, and proceeding to terminate his employment on July 31, 2024, in gross violation of Plaintiff's rights under federal and Connecticut state law.

83.     Defendant's actions, including withholding commissions, reassigning accounts, providing unfavorable performance reviews, and ultimately terminating Plaintiff's employment, occurred directly following his cancer diagnosis and intermittent medical leave for cancer surgery and treatment.

### *Defendant Terminates Plaintiff's Employment in Direct Interference with his ERISA-Protected Life Insurance Benefits*

84.     Adding further harm to Defendant's decision to terminate Plaintiff, during his employment, Plaintiff was a plan participant in Defendant's ERISA-covered life insurance plan, which provided substantial benefits to his family in the event of his death during employment.

85.     Under the terms of his policy, if Plaintiff were to die during his employment, his spouse was entitled to receive a $2,000,000.00 death benefit, plus 50% of Plaintiff's annual earnings for ten years proceeding after his death.

86.     The life insurance policy specifically included a Survivor Income Benefit valued at $1,657,150.00, Supplemental Life coverage of $332,000.00, Basic AD&D coverage of $995,000.00, and Basic Life coverage of $995,000.00, for a combined total of $3,979,150 in life insurance benefits.

87.     Defendant's decision to unjustifiably and unlawfully withhold Plaintiff's commissions while "eliminating" his position demonstrates that Defendant—a multi-trillion-dollar company—was betting that Plaintiff would succumb to his cancer diagnosis.

88.     By withholding millions from his pay and separating his employment, Defendant attempted to save the company many millions of dollars over ten years based on its bet that Plaintiff would pass away before getting the chance to fight against this gross miscarriage of justice.

89.     Immediately following Plaintiff's termination, Defendant canceled all of his life insurance coverage effective July 30, 2024, as evidenced by the termination notice sent to Plaintiff.

90.     Due to Plaintiff's Stage 4 cancer diagnosis and ongoing treatment, it became impossible for him to obtain any replacement life insurance, let alone one that compares to the significant benefits he had as a Defendant employee.

91.     The total present value of these lost term life insurance benefits is $2,801,893.00, which includes Basic/Supplemental Life Insurance ($1,543,592.00), Survivor Income Benefits to Spouse ($1,255,017.00), and Survivor Income Benefits to Children ($14,484.00), less required employee contributions ($11,199.00).

92.     Defendant's actions in terminating Plaintiff's employment while he was undergoing cancer treatment, immediately after he had secured one of the company's largest deals worldwide, can only be reasonably explained as an attempt to avoid potential liability under the ERISA-covered life insurance plan.

93.     Defendant's conduct constitutes unlawful interference with Plaintiff's right to receive benefits under the terms of existing plans in violation of Section 501 of the Employee Retirement Income Security Act.

### FIRST CLAIM FOR RELIEF AGAINST DEFENDANT
#### *Violation of Section 510 of the ERISA*

94.     Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

95.     Section 510 of ERISA, 29 U.S.C. § 1140, makes it unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

96.     Plaintiff was a participant in Defendant's ERISA-covered life insurance plan. Under the terms of his policy, if Plaintiff were to die during his employment, his spouse was entitled to receive a significant death benefit, plus 50% of Plaintiff's annual earnings for the next ten years.

16

97.    Defendant intentionally interfered with Plaintiff's attainment of rights under the ERISA-covered life insurance plan by terminating his employment shortly after learning of his Stage 4 colon cancer diagnosis. This termination was pretextual and designed to prevent Plaintiff from receiving benefits under the life insurance plan.

98.    As a direct and proximate result of Defendant's violation of Section 510 of ERISA, Plaintiff has suffered the loss of valuable employee benefits, for which he is entitled to appropriate equitable relief, including but not limited to reinstatement of benefits, restitution, and disgorgement of any profits Defendant may have realized by its actions, as well as his reasonable attorneys' fees and costs incurred to vindicate his rights.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANT
### *Violation of Connecticut's Wage Payment Law, CT Gen Stat § 31-72*

99.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

100.    Connecticut General Statutes § 31-72 provides that when an employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, such employee may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court.

101.    Defendant willfully failed to pay Plaintiff his earned commissions, which constitute wages under Connecticut law. Specifically, Defendant withheld approximately $2,000,000.00  in owed and earned commissions from the Otis Elevator contract, which Plaintiff personally stewarded and closed in December 2023.

102.    As a direct and proximate result of Defendant's willful violation of CT Gen Stat § 31-72, Plaintiff has suffered economic losses in the form of unpaid wages and continues to suffer

such losses, for which he is entitled to an award of twice the full amount of such wages, plus costs and reasonable attorney's fees.

### THIRD CLAIM FOR RELIEF AGAINST DEFENDANT
*Violation of Connecticut's Wage Payment Law, CT Gen Stat § 42-482*

103.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

104.    Connecticut General Statutes § 42-482 provides that a principal shall pay a sales representative all commissions that are due at the time of termination of the contract between the sales representative and principal within thirteen days after the date of termination or within thirteen days after the date such commissions become due, whichever is later.

105.    Defendant willfully failed to pay Plaintiff his earned commissions within the statutorily required timeframe following the termination of his employment on July 28, 2024. These commissions, amounting to over $2,000,000.00, were earned from the Otis Elevator contract closed in December 2023 and were due at the time of Plaintiff's termination.

106.    As a direct and proximate result of Defendant's willful violation of CT Gen Stat § 42-482, Plaintiff has suffered economic losses in the form of unpaid commissions and continues to suffer such losses, for which he is entitled to an award of damages, including but not limited to actual damages, punitive damages, and reasonable attorney's fees and court costs as provided by the statute.

### FOURTH CLAIM FOR RELIEF AGAINST DEFENDANT
*Fraudulent Inducement in Violation of Connecticut Law*

107.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

18

108.    Under Connecticut law, a party to a contract is prohibited from engaging in materially false conduct designed to induce another party to enter into a contract.

109.    As described above, during January 2023, while Plaintiff was working remotely in his home office in Connecticut, Defendant through Justin Srb, who was also located in Connecticut, fraudulently induced Plaintiff to continue pursuing the Otis account by expressly authorizing an "exception" to Plaintiff's Spender plan, permitting him to continue to pursue the Otis account under the terms of the "Greenfield" sales plan.

110.    At the time, Plaintiff specifically proposed and requested to Srb that he enter into a formal agreement in writing that would have set forth the terms that would govern any future sale or contract with Otis.

111.    Defendant, through Srb, rejected this request without explanation, and instead allowed and encouraged him to continue to pursue the Otis deal as a "Greenfield" account notwithstanding Plaintiff's "Spender" rep status.

112.    In material reliance on Defendant's false promise that he would be compensated according to the Greenfield plan's commission structure if successful, and directly contravening his representation and rejection that Plaintiff need not enter into a separate side agreement regarding the Otis account, from January 2023 through December 2023, Plaintiff dedicated substantial time, effort, and resources to securing the Otis deal, which ultimately culminated in a landmark $35,000,000.00 contract in December 2023.

113.    Plaintiff would not have continued pursuing the Otis account absent this specific and material representation regarding his compensation.

114.    Upon Plaintiff's successful closing of the Otis deal in December 2023, approximately one month later in or around early January 2024, Defendant, through Justin Srb,

revealed that the "exception" granted to Plaintiff was purportedly limited to allowing him to sell the Otis account, but not to be paid commissions on it.

115.    Defendant then used this fraudulent reinterpretation of the "exception" to avoid paying Plaintiff his earned and owed commissions of approximately $1,000,000.00 upon closing in December 2023, plus an additional approximately $1,000,000.00 over the five-year life of the deal, for a combined total of $2,000,000.00 in owed and earned commissions.

116.    Plaintiff again relied upon Defendant's materially false and fraudulent misrepresentation by continuing to work diligently for Defendant, even while undergoing rigorous chemotherapy treatments for his Stage 4 colon cancer, believing that Defendant would eventually honor its commitment to pay him his rightful commissions.

117.    Plaintiff has and continues to suffer damages from Defendant's fraud, in the form of underpayment and failure to make prompt payment of his earned commissions, and special damages incurred due to the inability to use and enjoy his money when it was due and owing, and needing to hire counsel to vindicate his rights.

118.    Defendant's fraudulent conduct is further evidenced by its shifting and contradictory explanations for refusing to pay Plaintiff his commissions after the conclusion of his employment that contrasted to those reasons given during his employment.

## FIFTH CLAIM FOR RELIEF AGAINST DEFENDANT
### *Breach of Contract*

119.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

120.    Plaintiff and Defendant entered into a valid and enforceable employment contract, which included terms regarding commission payments for successful sales.

121.    Plaintiff fully performed his obligations under the contract by successfully closing the Otis Elevator deal, which was worth $35,000,000.00 and ranked as the seventh largest in the Americas and the eleventh largest deal worldwide for Defendant in 2023.

122.    Defendant breached the contract by failing to pay Plaintiff his earned commissions of approximately $2,000,000.00, as stipulated in the employment agreement. This breach occurred despite previous assurances and contrary to standard company practices.

123.    As a direct and proximate result of Defendant's breach of contract, Plaintiff has suffered economic losses in the form of unpaid commissions, for which he is entitled to an award of monetary damages, including but not limited to the full amount of the unpaid commissions, consequential damages, and pre-judgment interest.

### SIXTH CLAIM FOR RELIEF AGAINST DEFENDANT
#### *Unjust Enrichment in Violation of Connecticut Law*

124.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

125.    Defendant promised to pay Plaintiff certain compensation for the work Plaintiff provided with respect to his employment as set forth in Defendant's sales representative agreements under and subsequent communication and correspondence between Plaintiff and Defendant.

126.    Plaintiff satisfactorily performed the work at Defendant's direction with the good-faith expectation of receiving the compensation promised to him as set forth herein and which is usual and customary and of reasonable value for the services rendered.

127.    Specifically, Defendant instructed Plaintiff to continue to attempt to sell Google Cloud Services to Otis Elevator, and Plaintiff did in fact do so, ultimately leading to the execution of a $35,000,000.00 million deal over a five-year term in December 2023.

128.    Defendant failed and refused to pay Plaintiff compensation, which was fair, reasonable, and customary, for his work in selling and completing the Otis Elevator contract.

129.    Defendant failed and refused to enter into a specific agreement or contract in writing with Plaintiff which would have set forth the express terms of the parties' understanding of Plaintiff's potentially eligible commission on the Otis contract, despite Defendant's verbal representation through Justin Srb that Plaintiff would be permitted to sell to Otis separate and apart from his "Spender" sales plan.

130.    Defendant's conduct is actionable based upon unjust enrichment / *quantum meruit* under Connecticut law.

131.    It is against equity and good conscience for Defendant to retain the benefit which has come to it as a result of Plaintiff's work and efforts in securing the Otis contract.

132.    As a result of Defendant's willful conduct, Plaintiff is entitled to recover his outstanding bonus and commission, plus interest, under a theory of *quantum meruit*, as a result of Defendant's actions.

## DEMAND FOR A JURY TRIAL

133.    Pursuant to FRCP 38(b), Plaintiff demands a trial by jury in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

a.    A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned United States and Connecticut State laws;

b.    Preliminary and permanent injunctions against Defendant and its officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with

them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

      c.      An award for all non-monetary and/or compensatory damages, including but not limited to, compensation for severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

      d.      Punitive damages to the extent authorized by law in an amount commensurate with Defendant's ability and so as to deter future unlawful conduct;

      e.      An order restraining Defendant from any further retaliation against Plaintiff for participation in any form in this litigation;

      f.      All damages that Plaintiff has sustained as a result of the Defendant's conduct, including all unpaid wages and any shortfall between wages paid and those due under the law that Plaintiff would have received but for Defendant's unlawful payment practices;

      g.      Liquidated damages and any other statutory penalties as recoverable under Connecticut's Wage Payment Law;

      h.      Awarding Plaintiff his costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

      i.      Pre-judgment and post-judgment interest, as provided by law; and

      j.      Granting Plaintiff such other and further relief as this Court finds necessary and proper.

Respectfully submitted,

 _/ s / Mariusz Kurzyna_
Mariusz Kurzyna (ct28940)
**ZIPIN, AMSTER & GREENBERG, LLC**
8757 Georgia Avenue, Suite 400
Silver Spring, MD 20910
Tel. 301-587-9373
Fax 240-839-9142
mkurzyna@zagfirm.com

Jon L. Norinsberg
(_pro hac vice_ application forthcoming)
Michael R. Minkoff
(_pro hac vice_ application forthcoming)
**JOSEPH & NORINSBERG, LLC**
110 East 59th Street, Suite 2300
New York, New York 10022
Tel.: (212) 227-5700
Fax: (212) 656-1889
jon@norinsberglaw.com
michael@employeejustice.com

_Counsel for Plaintiff_