**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| PETER MARTIN, | Case No.: 3:25-cv-00587 |
| Plaintiff, | |
| -against- | **JURY TRIAL DEMANDED** |
| GOOGLE LLC, | |
| Defendant. | |

**SECOND AMENDED COMPLAINT**

Plaintiff, PETER MARTIN ("Plaintiff" or "Martin"), by and through his attorneys, Joseph & Norinsberg, LLC and Zipin, Amster & Greenberg, LLC, as and for his Second Amended Complaint against GOOGLE LLC ("Defendant" or "Google"), alleges upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

**NATURE OF THE CASE**

1.      This is a civil action for damages and equitable relief based upon Defendant's willful violations and pattern of discriminatory behavior against Plaintiff following Plaintiff's disclosure of his Stage 4 colon cancer diagnosis.

2.      Defendant committed willful violations of the rights guaranteed to Plaintiff by: (i) the Americans with Disabilities Act of 1990, as amended ("ADA"); (ii) the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-51 et seq. ("CFEPA"); (iii) Sections 502 and 510 of the Employee Retirement Income Security Act ("ERISA"); and (iv) Connecticut's Wage Payment Law, Conn. Gen. Stat. § 31-72. Plaintiff asserts further claims of (v) Promissory estoppel;

1

(vi) Negligent misrepresentation; (vii) Quantum meruit; (viii) Breach of implied-in-fact contract; (ix) Breach of implied covenant of good faith and fair dealing; and (x) Unjust enrichment.

**PRELIMINARY STATEMENT**

3.      This is a case of egregious disability discrimination, wage theft, and interference with life insurance benefits inflicted against Plaintiff by a duplicitous employer that seeks to unjustly and unlawfully keep the fruits of Plaintiff's labor for itself.

4.      Plaintiff's exceptional performance as a dedicated and high-performing Enterprise Field Sales Representative at Google culminated in Plaintiff single-handedly originating, driving, and ultimately securing a landmark $35 million contract with Otis Elevator.

5.      As described in detail below, Defendant unlawfully discriminated against Plaintiff through consistent and escalating adverse employment actions including denying recognition and promotional opportunities and reassigning valuable accounts and ultimately terminating Plaintiff's employment.

6.      Google made promises to Plaintiff despite knowing that it had no intention of fulfilling them, inducing Plaintiff to rely on those promises, and then failing to uphold its end of the bargain.

7.      Indeed, Google specifically terminated Plaintiff to intentionally interfere with Plaintiff's life insurance benefits.

8.      Defendant's willful and intentional conduct violates federal and state law, starkly contradicts its public image of fairness and inclusivity, revealing a disturbing willingness to abjectly discriminate against Plaintiff who is fighting a life- threatening illnesses.

9.      Defendant's actions, including the withholding of upwards of $2,000,000.00 in earned commissions and the termination of Plaintiff's employment, intentional interference that

resulted in the loss of Plaintiff's stock options and Plaintiff's company-issued life insurance policy worth upwards of $3,000,000.00, demonstrate a callous disregard for employee rights and legal protections.

10.     This lawsuit seeks to hold Defendant accountable for its discriminatory practices and to secure just compensation for Plaintiff, who has suffered significant financial losses and emotional distress while battling a life-threatening illness. The case underscores the critical importance of upholding workplace protections for employees with disabilities and sends a clear message that even the most powerful corporations must adhere to anti-discrimination laws.

## JURISDICTION AND VENUE

11.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, as this action arises under 42 U.S.C. § 12101, et seq. The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1367 over all claims arising under Connecticut law.

12.     In addition, federal jurisdiction of this Court is separately invoked pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and the action arises between Plaintiff, a citizen of Connecticut, and Defendant, a Delaware limited liability company whose lone member is Alphabet Inc., a separate Delaware corporation.

13.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims for relief occurred in this judicial district.

## ADMINISTRATIVE PREREQUISITES

14.     Prior to filing this Complaint, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging, inter alia, discrimination in violation of the ADA.

15. On or around September 29, 2025, the EEOC issued Plaintiff a Notice of Right to Sue.

16. On or around December 9, 2025, the Parties entered into a tolling agreement that tolled Plaintiff's deadline to file his claims asserted under the Americans with Disabilities Act ("ADA") and Connecticut Fair Employment Practices Act ("CFEPA") relevant to the instant Action ("Discrimination Claims") until 30 days after a decision was entered on the Defendant's then-pending Motion to Dismiss.

17. A decision was entered on the Defendant's Motion to Dismiss on March 9, 2026.

18. Any and all other prerequisites to the filing of this action have been met.

## **PARTIES**

19. At all relevant times, Plaintiff worked remotely for Defendant in Connecticut and was an "employee" entitled to the protections as defined by the Americans with Disabilities Act, the ERISA, and Connecticut's Wage Payment Law.

20. Defendant is a limited liability company organized under the laws of Delaware, with its principal place of business located in California.

21. The sole member of Defendant's limited liability company is Alphabet Inc., a separate Delaware corporation.

22. At all relevant times herein, Defendant employs fifteen or more "employees," and is thus an "employer" within the meaning of the ADA, the CFEPA, the ERISA, and Connecticut's Wage Payment Law.

4

## BACKGROUND FACTS

**Plaintiff Begins His Employment with Defendant.**

23.     Google is the multinational subdivision of Alphabet Inc., best known for its internet search engine technology and various cloud-based computing, advertisement, and marketing services.

24.     Plaintiff worked as an Enterprise Field Sales Representative for Defendant from July 6, 2020 until his unlawful termination on July 31, 2024.  This role involved managing and expanding Defendant's engagement with strategic accounts.

25.     When Plaintiff was hired by Defendant, he was part of a new and expanding sales team for the Google Cloud division. As such, there were no formal separate or segmented divisions within Google Cloud, with each sales representative selling to both existing customers and new customers.

26.     New customers are known within Google as "Greenfield" accounts, while existing customers are known as "Spender" accounts.

27.     Plaintiff's direct manager, Justin Srb ("Srb"), established the "New England" territory for Greenfield clients.

28.     Plaintiff was assigned to the Greenfield "New England" territory and reported directly to Mr. Srb.

29.     It is well-known and acknowledged within Google, and generally in the technology sales field, that building Greenfield business is a time-intensive and expensive endeavor.

30.     Upon information and belief, after the first year of Plaintiff's employment, virtually no members of Plaintiff's seven-person team had landed any new business.

31.    Despite Mr. Srb's and his team's ongoing struggles, Defendant assigned Mr. Srb a $60,000,000.00 Spender account, Priceline.com.

**Defendant Segments its Sales Team and Encourages Plaintiff to Pursue and Secure the Lucrative "Otis Elevator" Account.**

32.    In 2023, Defendant formally segmented Plaintiff's sales team into "Greenfield" and "Spender" representatives.

33.    Greenfield representatives exclusively sold to new clients, while Spender representatives serviced and attempted to upsell to existing Google clients.

34.    Defendant also maintained "hybrid" sales representatives, who were permitted to maintain and pursue both Spender and Greenfield accounts.

35.    Appropriately, different compensation plans are applicable to different categories of sales.

36.    The Greenfield compensation plan provides lucrative financial incentives for securing new business for Defendant, and is substantially more lucrative than both the Spender and Hybrid compensation plans.

37.    A sales representative may service a Greenfield account despite being labelled a Spender account sales representative, and vice versa.

38.    In 2023, Defendant formally labelled Plaintiff as a Spender account sales representative.

39.    At the time of Plaintiff's labelling as a Spender account sales representative, he was already multiple years into pursuing a Greenfield account: Otis Elevator (the "Otis Account").

40.    Despite Plaintiff's label as a Spender account sales representative, Plaintiff's two supervisors, Arun Parmar ("Parmar") and Mr. Srb, both expressly authorized Plaintiff to continue pursuing the Otis Account.

41.    Critically, Mr. Parmar and Mr. Srb promised and represented to Plaintiff that his pursuit of, and ultimate compensation for, the Otis Account would be governed by the lucrative Greenfield compensation plan.

42.    At the same time, the other Spender accounts managed by Plaintiff would continue to be governed by the applicable Spender compensation plan.

43.    While permitting Plaintiff to pursue the Otis Account was a change in the primary duties of a Spender account sales representative such as Plaintiff, it was not a variance or contradiction of any written agreement between Plaintiff and Defendant.

44.    Plaintiff exerted substantial efforts across a rigorous three-year endeavor that demanded extensive planning and coordination in furtherance of the Otis Account and in reliance on Mr. Parmar's and Mr. Srb's representation that compensation for the Otis Account would be governed by the Greenfield compensation plan.

45.    On July 20, 2023, Plaintiff was diagnosed with Stage 4 Colon cancer. Upon learning of his illness, Plaintiff immediately informed his supervisors, including Mr. Srb.

46.    In December 2023, Plaintiff secured the landmark $35,000,000.00 contract for the Otis Account.

47.    On December 12, 2023, Mr. Parmar congratulated Plaintiff's work on the Otis Account, praising Plaintiff for "pushing the right buttons to elevate Otis to the next level of its digital transformation journey."

**Defendant Makes Promises to Plaintiff and Denies Plaintiff Earned Compensation.**

48.    Throughout the process of securing the Otis Account, Defendant knowingly and intentionally concealed from Plaintiff the fact that it would later refuse to pay Plaintiff his earned commissions and incentives on the Otis Account.

49. Defendant denied Plaintiff earned compensation on the duplicitous and pretextual grounds that Plaintiff was not eligible to receive compensation from the Otis Account since he was labelled as a Spender sales representative and, therefore, his job duties were to service existing business.

50. More specifically, Defendant encouraged Plaintiff to continue his years-long pursuit of the Otis Account with the promise, agreement, and mutual understanding that Plaintiff would be compensated according to the Greenfield compensation plan's structure if successful.

51. Defendant's promise did not vary or contradict any written agreement between Plaintiff and Defendant.

52. Indeed, Plaintiff specifically proposed and requested to Srb that Plaintiff and Defendant enter into a formal agreement - in writing - that would set forth the terms that would govern Plaintiff's compensation for the Otis Account.

53. Defendant, through Mr. Srb, rejected Plaintiff's request without explanation.

54. Mr. Srb continued to promise and encourage Plaintiff to continue to pursue the Otis Account deal as a Greenfield account notwithstanding Plaintiff's "Spender" sales representative status.

55. Plaintiff relied on Defendant's promises and continued to dedicate substantial time, effort, and resources to securing the Otis deal, which ultimately culminated in a landmark $35,000,000.00 contract in December 2023.

56. Defendant then denied Plaintiff his earned compensation.

57. In a classic bait-and-switch, after Plaintiff had successfully secured the Otis Account, Mr. Srb informed him that, despite having authorized him to pursue the business, Defendant would not pay him any commissions on it.

58.     Defendant did not identify any written agreement, contract, term, or provision, that served as the basis of Defendant's denial.

59.     Defendant knew at the time it promised Greenfield compensation to Plaintiff to pursue the Otis Elevator deal that it had no intention of paying Plaintiff the commissions he would earn under the Greenfield compensation plan.

60.     Defendant made intentional misrepresentations to induce Plaintiff to continue pursuing the Otis Account, knowing that Plaintiff would not have dedicated his time and effort to securing the deal had he known he would not receive any commission.

61.     Plaintiff reasonably relied on Defendant's misrepresentations to his detriment, foregoing other opportunities to pursue and/or service accounts that would have resulted in commission payments.

**Plaintiff Relied on Defendant's False Promises to his Detriment and is Owed Significant Compensation for Landing the Otis Account.**

62.     Defendant formally—and internally—published documents outlining the prior commission structures and "Sales Bonus Plans" for its Field Sales Representatives.

63.     Among the documents published by Defendant detailing the commission structure for Field Sales Representatives, which includes Plaintiff, is a plan entitled "Plan 1002 Details:  FSR/CE Greenfield NAL."

64.     Pursuant to the plain terms of the plan under which Plaintiff was promised compensation for the Otis Account - "Plan 1002 Details: FSR Greenfield NAL"—Plaintiff's achievement of the $35 million Otis Account qualified him for the maximum 500% On Target Variable ("OTV") compensation cap in 2023 and likely for 2024.

65.     The plan explicitly states that "500% is the maximum percentage of eligible OTV that a Sales Googler can earn during the Plan Term."

66. Indeed, Plaintiff's achievement meets or exceeds every criterion for maximum compensation under the plan.

67. The Otis Account included both "Analytics" and "Databases," both explicitly listed as "Strategic Product Multiplier Eligible Products" in the plan, activating a 1.25x multiplier.

68. As a five-year agreement, the Otis deal exceeds the three-year threshold required for the contract term multiplier of an additional 1.25x.

69. Moreover, any new subscription products included in the deal provided an additional multiplier of 2.0x.

70. Next, with at least three separate "Count of Wins" ("COW") associated with the deal, Plaintiff clearly met the COW quota referenced in the document, which removes the acceleration gate cap. The plan explicitly states that once the COW quota is met, acceleration can exceed 1.5x, as much as up to 6x.

71. Plaintiff's successful closure of the Otis Account – while battling cancer - would have quintupled Plaintiff's compensation based on Defendant's Greenfield compensation plan.

72. Specifically, under the plain terms of Defendant's FY23 Greenfield Plan, Plaintiff's achievement with the $35,000,000.00 Otis Account qualified him for his maximum potential earnings for 2023, which was 500% of the OTV compensation cap in 2023, calculated at $994,290.00.

73. In addition, given the five-year length of the contract, the deal separately entitled Plaintiff to an additional approximately $1,000,000.00 over the five-year life of the deal.

74. As a direct result of Defendant's promises, misrepresentations, and inducements, Plaintiff was deprived of approximately $1,000,000.00 upon closing of the Otis Account in

December 2023, and an additional minimum of approximately $1,000,000.00 over the five-year life of the deal, for a combined total of at least $2,000,000.00 in owed and earned commissions.

75. Defendant has been unjustly enriched by receiving the full benefit of Plaintiff's work in securing the $35,000,000.00 Otis Account, which was the largest deal in the Eastern region, seventh largest in the Americas, and eleventh largest worldwide for Google that year.

76. Defendant regularly granted and paid out commissions to other sales representatives as dictated by the various applicable compensation plans.

77. Commissions, bonuses, and incentive payments as dictated by the various applicable compensation plans formed material elements of Defendant's sales representatives' wages.

78. Tellingly, while Defendant refused to pay Plaintiff any commission for the Otis Account, both of Plaintiff's supervisors - Mr. Srb and Gia Winters ("Winters") - received revenue credit and commissions for the deal as if the deal had been a Greenfield sale. Only Plaintiff was not compensated according to the Greenfield terms.

79. Other coworkers who supported Mr. Martin in his pursuit of the Otis sale, including Manoj Methil, were paid Greenfield bonuses for their work.

80. The Otis sale was completed in December of 2023. However, on Mr. Martin's January 2024 performance review, the sale still appeared as "in pursuit." When Mr. Martin asked Srb why the sale did not show as complete on his review, even though it had been finalized in December, Srb waved away his concerns, saying that the performance reviews were done prior to the sale being final. However, upon information and belief, the Otis sale did appear as a completed sale in performance reviews for other members of the team, including Parmar, Kevin Fitzpatrick, Gia Winters, Shruti Dhumak, Jessica Schablein, and others connected to the sale.

**Defendant Discriminates against Plaintiff Because of Plaintiff's Cancer Diagnosis.**

81.    On July 20, 2023, Plaintiff was diagnosed with Stage 4 colon cancer.

82.    Upon learning of his illness, Plaintiff immediately informed his supervisors, including Mr. Srb.

83.    In August 2023, Plaintiff contacted Arun Parmar regarding the process for requesting reasonable accommodations for his cancer treatment.

84.    Despite undergoing rigorous chemotherapy treatments starting in August 2023, Plaintiff, as described above, continued his pursuit of the Otis Account, consistently honored all his professional commitments, and never missed a day of work due to his treatment.

85.    Despite Plaintiff's dedication to his work for Defendant, Plaintiff's diagnosis was nearly terminal with a survival rate of less than 15%.

86.    Defendant knew, or should have known, that Plaintiff's diagnosis was likely terminal, based on the detailed discussions that Plaintiff had had with both Srb and Parmar.

87.    Shortly after his cancer diagnosis, in December 2023, Plaintiff's efforts culminated in the landmark $35,000,000.00 Otis Account.

88.    As described above, despite this remarkable achievement, in December 2023 – and just months after Plaintiff's cancer diagnosis – Mr. Srb informed Plaintiff that he would receive zero commission for the Otis Account.

89.    Defendant purposely and intentionally waited until after Plaintiff had sealed and delivered the Otis Account to start its discriminatory campaign against him while reaping all the benefits of his hard work.

90.    Meanwhile, Mr. Srb and Ms. Winters received revenue credit and commissions for the same deal.

12

91.    Plaintiff inquired with Defendant as to why he was not receiving his owed compensation, including commissions, bonuses, and incentives as set forth in the Greenfield compensation plan and applicable to the Otis Account.

92.    Defendant set forth a series of shifting explanations for Defendant's refusal to pay Plaintiff his earned commissions.

93.    Mr. Srb initially responded to Plaintiff that Defendant granted him a limited "exception" from his Spender status to allow him to sell the Otis Account, but that "exception" did not allow him to be paid or receive compensation for the Otis Account pursuant to the Greenfield compensation plan.

94.    Mr. Srb's statements directly contradicted Defendant's previous promises and representations to Plaintiff.

95.    This decision starkly contrasted with the treatment of his colleague Jessica Hotes, who in the previous year had sold a similarly sized deal while working in the same role as Plaintiff but critically, without any disability or cancer diagnosis, and was not only paid generously but also, received significant public praise and professional advancement opportunities.

96.    Plaintiff was pointedly excluded from consideration for Defendant's prestigious Presidents Club, Horizon Award, and any promotional opportunities, deviating drastically from Defendant's usual protocol for recognizing and rewarding significant achievements.

97.    While Mr. Srb and Ms. Winters received revenue credit and commissions for booking the Otis deal, Plaintiff's significant contributions were overlooked, and he was paid zero.

98.    On or about January 22, 2024, Plaintiff formally complained to Justin Srb in writing regarding his treatment, sharing data regarding the impact the Otis deal had on the company and stating that he was "struggling with [his] situation."

99.    These shifting justifications conflicted with Defendant's real-time explanations given to Plaintiff during his employment by Mr. Srb and others, further demonstrating Defendant's false pretextual reasoning, while at the same time revealing Defendant's true unlawful motivation.

**Defendant Unlawfully Demotes Plaintiff and Reduces his Responsibilities.**

100.    After denying Plaintiff his earned compensation, Defendant continued to engage in escalating series of discriminatory acts against Plaintiff.

101.    In January 2024, Plaintiff was in the midst of chemotherapy and radiation treatment but voluntarily chose to miss a day of his treatment to attend an in-person sales kickoff meeting in London.

102.    There, despite his physical discomfort from ongoing cancer treatments, Plaintiff attempted to engage with Gia Winters and Michael Clark about the Otis Account. Ms. Winters and Mr. Clark met Plaintiff with extreme indifference, refusing to engage in any discussions with him. They met his introduction with an actual grimace and walked away, disregarding his presence entirely, further exemplifying Defendant's disregard for his contributions and ongoing discrimination.

103.    On a conference call with the Otis team in February 2024, Arun Parmar loudly and repeatedly told Plaintiff to "shut up" while Plaintiff was speaking to customers.

104.    In early 2024, Defendant demoted Plaintiff in a further discriminatory act of adverse employment action.

105.    With no grounds for doing so based on Plaintiff's job performance, Defendant reassigned Plaintiff's largest spending accounts - Bright Horizons and Bally's, along with his largest net new target account, Xerox (which was a pending $70,000,000.00 opportunity) - to other representatives on the team.

14

106.    Defendant instead assigned Plaintiff to two smaller, non-enterprise accounts, categorized as SMB (Small and Medium Business) and collectively generating less than $200,000.00 in combined annual revenue.

107.    This drastic reduction in account quality and potential revenue was a stark departure from the high-value accounts Plaintiff regularly handled.

108.    Shockingly, after reassigning Plaintiff to lower value accounts, Mr. Parmar asked Plaintiff why he was still working for Defendant instead of returning to his previous employer.

109.    Defendant continued to discriminate against Plaintiff by baselessly lowering his performance review rating after he reported his cancer diagnosis.

110.    Instead of Plaintiff's previous year's rating of 3 out of 5, or "Exceeds Expectations," Plaintiff's performance review in January 2024 was lowered to 2 out of 5.

111.    Defendant intentionally lowered Plaintiff's performance review to create a pretextual reason for future termination.

112.    Defendant specifically omitted any reference to Plaintiff's extraordinary success in pulling in the Otis Account.

113.    By contrast, Plaintiff's lead engineer, Kevin Fitzpatrick, still received a 3 out of 5 rating, with the Otis deal well documented in his review, despite that he was on leave for six months during the relevant period.

114.    Defendant's promises of additional stock equity and a pay increase were also rescinded after Plaintiff's cancer diagnosis.

115.    In contrast, Plaintiff's colleague, Jesse Adelson - someone with no similar achievement and who was not suffering from a disability - received the same low performance

review rating as Plaintiff but was still awarded more equity than Plaintiff, as well as a salary increase, underscoring Defendant's unlawful and discriminatory application of its own policies.

116.    Indeed, in direct contradiction of Defendant's low performance review, Plaintiff single-handedly planned and executed an "executive summit" event, requested by the Otis CIO, CTO, Executive VP, and CDIO. This all-day event, held on March 12, 2024, involved high-profile attendees including the CEO of Google Cloud Thomas Kurian, and Matt Renner, the Head of Global Revenue, among others, including management from Defendant's real estate holdings division.

117.    During this meeting, three senior Otis Executives - Neil Green, Otis's Executive Vice President and Chief Digital Information Officer; Rina Leonard, Otis's Chief Information Officer; and Ezhil Nanjappan, Otis's Chief Technology Officer - specifically shared their significant satisfaction and appreciation of Plaintiff's efforts, professionalism, and success in managing their account over the past three years. They collectively emphasized that securing the trust and business at Otis is not easy, while ultimately expressing and highlighting the critical and unequalled importance that Plaintiff played in Otis's decision to sign with Defendant.

118.    Federico Garcia Parra, Head of Global Strategic Accounts at Otis, explicitly praised the deal and Plaintiff's critical involvement to Google's leadership, stating that Plaintiff "started the journey" with Mr. Parra "a couple of years ago" and noting how it was "very fulfilling to see the fruits of months and hours of discussions" thanks to "Pete's vision and strategy."

119.    Mr. Parra's comments were conspicuously and intentionally ignored by Defendant's upper echelon, including Gia Winters, Managing Director of Northeast Region, and Michael Clark, President of North America Sales.

**Defendant Suddenly and Unlawfully Terminates Plaintiff's Employment**

120.    On May 29, 2024, Plaintiff was abruptly terminated by Defendant and informed by Mr. Srb that his role was "being eliminated" effective July 28, 2024.

121.    Notably, Mr. Srb explicitly stated that the decision had nothing to do with Plaintiff's performance, and that it was instead due to a "reduction in force." This was an outright fabrication.

122.    Plaintiff aggressively pushed back against this unlawful termination, repeatedly emphasizing that his success warranted keeping him on the team, and noting further that he was in the process of attempting to double the Otis Account from $35 million to potentially $70 million.

123.    In fact, just a few minutes before his termination meeting, Plaintiff had received a peer bonus in congratulations for his work with Otis.

124.    On July 1, 2024, Defendant sent Plaintiff an email stating that he had "been assigned to the territory Northeast 2 ENT Geo [] with the role of Enterprise FSR. Please check your Book of Business [ ] to see the accounts assigned to you." He then received several more emails stating that he had been assigned to territories over the course of the next several months.

125.    Based on these communications, Plaintiff believed that he was no longer terminated, but he continued to repeatedly seek clarification from Defendant to confirm whether or not he was still going to be employed.

126.    Plaintiff continued to receive work emails through at least July 9, 2024.

127.    On July 11, 2024, Defendant posted several job openings for a "Field Sales Representative, Enterprise, Northeast, Google Cloud - Cambridge" position - the exact same job that Plaintiff held in the exact same Northeast territory and the same position that Mr. Srb falsely told Plaintiff was being eliminated.

128.    Plaintiff learned from Otis staff that they had met privately with Defendant's leadership to voice their concerns and severe displeasure that Plaintiff would be removed from managing their account, noting that it was his efforts and his efforts alone that led them to sign with Defendant. Defendant claimed that they had nothing to worry about, going so far as to generate automated emails to Plaintiff that made it appear as though he was not being terminated after all.

129.    Still, Defendant reversed course yet again, rescinded Plaintiff's reassignment, and proceeded to terminate Plaintiff's employment on July 31, 2024.

130.    Defendant terminated Plaintiff's employment in a final discriminatory step as a result of Plaintiff's cancer diagnosis – after consistently demoting Plaintiff's responsibilities and the level of his accounts – and to prevent Plaintiff from realizing any benefits from the later years of the five-year Otis contract.

131.    Defendant has retained, and continues to retain, the benefits of the Otis Elevator contract, valued at $35,000,000.00 over five years, without providing any compensation to Plaintiff for his work in securing it, resulting in Defendant's unjust enrichment at Plaintiff's expense.

132.    Defendant's actions, including withholding commissions, reassigning accounts, providing unfavorable performance reviews, and ultimately terminating Plaintiff's employment, occurred directly following his cancer diagnosis and intermittent medical leave for cancer surgery and treatment.

**Defendant Terminates Plaintiff's Employment in Direct Interference with his ERISA-Protected Life Insurance Benefits.**

133. Adding further harm to Defendant's decision to terminate Plaintiff, during his employment, Plaintiff was a plan participant in Defendant's ERISA-covered life insurance plan, which provided substantial benefits to his family in the event of his death during employment.

134. Under the terms of his policy, if Plaintiff were to die during his employment, his spouse was entitled to receive a $2,000,000.00 death benefit, plus 50% of Plaintiff's annual earnings for ten years following his death.

135. The life insurance policy specifically included a Survivor Income Benefit valued at $1,657,150.00, Supplemental Life coverage of $332,000.00, Basic AD&D coverage of $995,000.00, and Basic Life coverage of $995,000.00, for a combined total of $3,979,150 in life insurance benefits.

136. Defendant's decision to unjustifiably and unlawfully withhold Plaintiff's commissions while "eliminating" his position demonstrates that Defendant—a multi-trillion-dollar company—was betting that Plaintiff would succumb to his cancer diagnosis.

137. Upon learning that Plaintiff had been diagnosed with Stage 4 colon cancer, Defendant knew or should have known that Plaintiff's diagnosis substantially increased the actuarial likelihood that Defendant would be required to pay out the full value of Plaintiff's life insurance benefits during the remaining term of his employment.

138. The temporal proximity between Plaintiff's cancer disclosure and Defendant's escalating adverse actions, combined with the magnitude of the financial exposure created by Plaintiff's diagnosis, supports a reasonable inference that Defendant's decision to terminate Plaintiff was motivated, at least in part, by a specific desire to eliminate the near-certain liability under Plaintiff's ERISA-covered life insurance plan.

139.    Despite Plaintiff's dedication to his work for Defendant, Plaintiff's diagnosis was nearly terminal with a survival rate of less than 15%.

140.    Defendant knew, or should have known, that Plaintiff's diagnosis was likely terminal, based on the detailed discussions that Plaintiff had had with Srb and Parmar.

141.    By withholding millions from Plaintiff's pay and separating his employment, Defendant intentionally interfered with Plaintiff's benefits to save the company many millions of dollars over ten years based on its bet that Plaintiff would pass away before getting the chance to fight against this gross miscarriage of justice.

142.    Immediately following Plaintiff's termination, Defendant canceled all of his life insurance coverage effective July 30, 2024, as evidenced by the termination notice sent to Plaintiff.

143.    Due to Plaintiff's Stage 4 cancer diagnosis and ongoing treatment, it became impossible for him to obtain any replacement life insurance, let alone one that compares to the significant benefits he had as a Defendant employee.

144.    The total present value of these lost term life insurance benefits is $2,801,893.00, which includes Basic/Supplemental Life Insurance ($1,543,592.00), Survivor Income Benefits to Spouse ($1,255,017.00), and Survivor Income Benefits to Children ($14,484.00), less required employee contributions ($11,199.00).

145.    Defendant terminated Plaintiff with the specific intent of avoiding the significant monetary liability under Plaintiff's ERISA-covered insurance plans.

146.    Defendant's conduct constitutes unlawful interference with Plaintiff's right to receive benefits under the terms of existing plans in violation of Section 501 of the Employee Retirement Income Security Act.

## FIRST CLAIM FOR RELIEF AGAINST DEFENDANT
### *Disability Discrimination in Violation of the ADA*

147. Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

148. During the full statutory period, Plaintiff was protected by the provisions of the ADA, 42 U.S.C. §§ 12101, et seq., and all applicable regulations thereunder.

149. At all relevant times, Defendant was an "employer" subject to the ADA.

150. As described above, Defendant was aware that Plaintiff suffered from recognized disabilities, specifically, Stage 4 Colon cancer.

151. By the actions described above, among others, Defendant discriminated against Plaintiff based on his recognized disabilities by, inter alia, denying Plaintiff earned compensation, demoting Plaintiff and removing his job-related responsibilities, and ultimately terminating his employment.

152. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of compensatory damages.

153. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, emotional distress for which he is entitled to an award of compensatory damages.

154. Defendant's unlawful and discriminatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and/or reckless indifference to Plaintiff's rights under the ADA, thereby entitling him to an award of punitive damages.

155. Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

21

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANT
### *Retaliation in Violation of the ADA*

156.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

157.    During the full statutory period, Plaintiff was protected by the provisions of the ADA, 42 U.S.C. §§ 12101, et seq., and all applicable regulations thereunder.

158.    At all relevant times, Defendant was an "employer" subject to the ADA.

159.    As described above, Defendant was aware that Plaintiff suffered from recognized disabilities, specifically, Stage 4 Colon cancer.

160.    Plaintiff engaged in activities protected under the ADA by contacting his manager regarding reasonable accommodations for his cancer treatments and taking intermittent medical leave for said treatments.

161.    By the actions described above, among others, Defendant retaliated against Plaintiff based on his protected activity by, inter alia, denying Plaintiff earned compensation, demoting Plaintiff and removing his job-related responsibilities, and ultimately terminating his employment.

162.    The causal connection between Plaintiff's protected activity and Defendant's conduct is clear in part due to temporal proximity and in part due to differential treatment of non-disabled employees who were similarly situated.

163.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of compensatory damages.

164.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, emotional distress for which he is entitled to an award of compensatory damages.

165.    Defendant's unlawful and retaliatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and/or reckless indifference to Plaintiff's rights under the ADA, thereby entitling him to an award of punitive damages.

166.    Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF AGAINST DEFENDANT
### *Discrimination in Violation of the CFEPA*

167.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

168.    During the full statutory period, Plaintiff was protected by the provisions of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-51 et seq. ("CFEPA").

169.    At all relevant times, Defendant was an "employer" subject to the CFEPA.

170.    As described above, Defendant was aware that Plaintiff suffered from recognized disabilities, specifically, Stage 4 Colon cancer.

171.    By the actions described above, among others, Defendant discriminated against Plaintiff based on his recognized disabilities by, inter alia, denying Plaintiff earned compensation, demoting Plaintiff and removing his job-related responsibilities, and ultimately terminating his employment.

172.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the CFEPA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of compensatory damages.

173.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the CFEPA, Plaintiff has suffered, and continues to suffer, emotional distress for which he is entitled to an award of compensatory damages.

23

174. Defendant's unlawful and discriminatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and/or reckless indifference to Plaintiff's rights under the CFEPA, thereby entitling him to an award of punitive damages.

175. Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF AGAINST DEFENDANT
### *Retaliation in Violation of the CFEPA*

176. Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

177. During the full statutory period, Plaintiff was protected by the provisions of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-51 et seq. and all applicable regulations thereunder.

178. As described above, Defendant was aware that Plaintiff suffered from recognized disabilities, specifically, Stage 4 Colon cancer.

179. Plaintiff engaged in activities protected under the CFEPA by contacting his manager regarding reasonable accommodations for his cancer treatments and taking intermittent medical leave for said treatments.

180. By the actions described above, among others, Defendant retaliated against Plaintiff based on his recognized disabilities by, inter alia, denying Plaintiff earned compensation, demoting Plaintiff and removing his job-related responsibilities, and ultimately terminating his employment.

181. The causal connection between Plaintiff's protected activity and Defendant's conduct is clear in part due to temporal proximity and in part due to differential treatment of non-disabled employees who were similarly situated.

24

182.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the CFEPA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of compensatory damages.

183.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the CFEPA, Plaintiff has suffered, and continues to suffer, emotional distress for which he is entitled to an award of compensatory damages.

184.    Defendant's unlawful and discriminatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and/or reckless indifference to Plaintiff's rights under the CFEPA, thereby entitling him to an award of punitive damages.

185.    Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

**FIFTH CLAIM FOR RELIEF AGAINST DEFENDANT**
*Violation of Sections 502 and 510 of the ERISA*

186.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

187.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

188.    ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), provides that "the court in its discretion may allow a reasonable attorney's fee and costs" in an action by a participant or beneficiary under ERISA.

189.    Section 510 of ERISA, 29 U.S.C. § 1140, makes it unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan or for

25

the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

190. Plaintiff was a participant in Defendant's benefit plans including Defendant's ERISA-covered life insurance plan.

191. Under the terms of his policy, if Plaintiff were to die during his employment, his spouse would be entitled to receive a significant death benefit, plus 50% of Plaintiff's annual earnings for the next ten years.

192. Defendants devised and executed a plan to deprive Plaintiff of his rights under the life insurance plan shortly after learning of his Stage 4 Colon cancer diagnosis.

193. Defendant's plan culminated in the wrongful termination of Plaintiff's employment.

194. Defendant violated ERISA § 502 by, among other things, failing to pay Plaintiff any vested percentage of his benefits upon termination of his employment with Defendant.

195. Defendant violated ERISA § 510 by unlawfully discharging Plaintiff as an employee of Defendant with the purpose and intent of interfering with Plaintiff's attainment of his rights and benefits.

196. As a direct and proximate result of Defendant's violation of Sections 502 and 510 of ERISA, Plaintiff has suffered the loss of valuable employee benefits, for which he is entitled to appropriate equitable relief, including but not limited to reinstatement of benefits, restitution, and disgorgement of any profits Defendant may have realized by its actions, as well as his reasonable attorneys' fees and costs incurred to vindicate his rights.

### SIXTH CLAIM FOR RELIEF AGAINST DEFENDANT
*Violation of Connecticut's Wage Payment Law, CT Gen Stat § 31-72*

197.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

198.    Connecticut General Statutes § 31-72 provides that when an employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, such employee may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court.

199.    Defendant willfully failed to pay Plaintiff his earned commissions, which constitute wages under Connecticut law.

200.    Specifically, Defendant withheld approximately $2,000,000.00 in owed and earned commissions from the Otis Account.

201.    As a direct and proximate result of Defendant's willful violation of CT Gen Stat § 31-72, Plaintiff has suffered economic losses in the form of unpaid wages and continues to suffer such losses, for which he is entitled to an award of twice the full amount of such wages, plus costs and reasonable attorney's fees.

### SEVENTH CLAIM FOR RELIEF AGAINST DEFENDANT
*Promissory Estoppel*

202.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

203.    Under Connecticut state law promissory estoppel requires: (1) that the defendant did or said something intended to induce another party to believe that certain facts existed and to act on that belief, (2) that the plaintiff changed its position based on those facts, and (3) that doing so incurred some injury.

27

204.    Defendant made a clear promise to Plaintiff that Plaintiff's pursuit of, and compensation based on closing, the Otis Account would be governed by the Greenfield compensation plan applicable at the relevant time.

205.    Defendant made the promise with the actual knowledge and specific intention of inducing Plaintiff to believe that he would be entitled to compensation based on the applicable Greenfield compensation plan if he ultimately closed the Otis Account.

206.    Acting in reliance on Defendant's promise, Plaintiff, as described above and despite suffering from Stage 4 Colon cancer, did everything in his power to pursue the Otis Account.

207.    Plaintiff dedicated time and resources in pursuit of the Otis Account in reliance on Defendant's promises.

208.    Plaintiff's reliance on Defendant's promises was both reasonable and foreseeable given the industry context, the parties' course of dealing, and Defendant's specific directives.

209.    Defendant has caused Plaintiff injury by withholding earned compensation from Plaintiff.

210.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered loss and damages, for which he is entitled to appropriate relief, including but not limited to full monetary damages, compensatory damages, and interest.

## EIGHTH CLAIM FOR RELIEF AGAINST DEFENDANT
### *Negligent Misrepresentation*

211.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

212.    Under Connecticut law, negligent misrepresentation requires that: (1) that the defendant made a misrepresentation of fact; (2) that the defendant knew or should have known

28

was false; and (3) that the plaintiff reasonably relied on the misrepresentation; and (4) suffered pecuniary harm as a result.

213.    Defendant made clear misrepresentations to Plaintiff that Plaintiff's compensation for the Otis Account would be governed by the Greenfield compensation plan applicable at the relevant time.

214.    Defendant, through Mr. Parmar and Mr. Srb, made representations to Plaintiff regarding his compensation for the Otis Account in circumstances in which Defendant knew or, in the exercise of reasonable care, should have known that such representations were false or misleading.

215.    Acting in reliance on Defendant's misrepresentations, Plaintiff, as described above and despite suffering from Stage 4 Colon cancer, did everything in his power to pursue the Otis Account.

216.    Defendant, through Mr. Parmar and Mr. Srb, made the representations to Plaintiff without exercising reasonable care to determine their accuracy or to ensure that Defendant would honor the represented compensation terms for the Otis Account.

217.    Plaintiff dedicated time and resources in pursuit of the Otis Account in reliance on Defendant's misrepresentations.

218.    Plaintiff's reliance on Defendant's misrepresentations was both reasonable and foreseeable given the industry context, the parties' course of dealing, and Defendant's specific directives.

219.    Defendant has caused Plaintiff injury by withholding earned compensation from Plaintiff.

29

220.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered loss and damages in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF AGAINST DEFENDANT
### *Quantum Meruit (Pleaded in the Alternative)*

221.    This claim is pleaded in the alternative to Plaintiff's contract-based claims. In the event that no enforceable express or implied contract governs Plaintiff's compensation for the Otis Account, Plaintiff is entitled to recovery under a theory of quantum meruit.

222.    Defendant knowingly accepted and benefited from Plaintiff's services in pursuing and securing the Otis Account over a period of approximately three years.

223.    The reasonable value of Plaintiff's services in securing the $35,000,000.00 Otis Account is no less than $2,000,000.00, based on the compensation that would have been payable under the Greenfield compensation plan for a deal of this magnitude.

224.    Plaintiff dedicated time and resources in pursuit of the Otis Account in reliance on Defendant's promises.

225.    Plaintiff's reliance on Defendant's promises was both reasonable and foreseeable given the industry context, the parties' course of dealing, and Defendant's specific directives.

226.    Defendant has caused Plaintiff injury by withholding earned compensation from Plaintiff.

227.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered loss and damages, for which he is entitled to appropriate relief, including but not limited to full monetary damages, compensatory damages, and interest.

## TENTH CLAIM FOR RELIEF AGAINST DEFENDANT
### *Breach of Implied-in-Fact Contract (Pleaded in the Alternative)*

228.    An implied-in-fact contract was formed through the parties' conduct and course of dealing. This implied-in-fact contract is evidenced by: (i) Defendant's promise to pay Plaintiff

30

certain compensation for the work Plaintiff provided with respect to the Otis Account and his employment; (ii) subsequent communication and correspondence between Plaintiff and Defendant; and (iii) Plaintiff's pursuit and closing of the Otis Account.

229.    Plaintiff performed and fulfilled his obligations pursuant to the parties' implied-in-fact contract.

230.    Defendant breached the implied-in-fact contract and its obligations by failing to pay Plaintiff.

231.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered loss and damages, for which he is entitled to appropriate relief, including but not limited to full monetary damages, compensatory damages, and interest.

## ELEVENTH CLAIM FOR RELIEF AGAINST DEFENDANT
### *Breach of Implied Covenant of Good Faith and Fair Dealing*

232.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

233.    The conduct and agreements between the parties as described in Count Seven implied a covenant of good faith and fair dealing between the parties.

234.    The Defendant knowingly induced Plaintiff into an implied-in-fact contract by making promises that Defendant knew *a priori* it would not fulfill.

235.    Defendant's actions constitute a breach of the implied covenant of good faith and fair dealing.

236.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered loss and damages, for which he is entitled to appropriate relief, including but not limited to full monetary damages, compensatory damages, and interest.

## TWELFTH CLAIM FOR RELIEF AGAINST DEFENDANT
### *Unjust Enrichment (Pleaded in the Alternative)*

237.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

238.    Defendant promised to pay Plaintiff certain compensation for the work Plaintiff provided, and Plaintiff agreed to perform such work.

239.    Plaintiff satisfactorily performed the work at Defendant's direction with the good-faith expectation of receiving the compensation promised to him as set forth herein and which is usual and customary and of reasonable value for the services rendered.

240.    Specifically, Defendant instructed Plaintiff to continue to attempt to sell Google Cloud Services to Otis Elevator, and Plaintiff did in fact do so, ultimately leading to the execution of a $35,000,000.00 million deal over a five-year term in December 2023.

241.    Defendant failed and refused to pay Plaintiff compensation, which was fair, reasonable, and customary, for his work in selling and completing the Otis Account.

242.    Defendant's conduct is actionable based upon unjust enrichment under Connecticut law.

243.    It is against equity and good conscience for Defendant to retain the benefit which has come to it as a result of Plaintiff's work and efforts in securing the Otis contract.

244.    As a result of Defendant's willful conduct, Plaintiff is entitled to recover his outstanding bonus and commission, plus interest, under a theory of unjust enrichment, as a result of Defendant's actions.

## DEMAND FOR A JURY TRIAL

245.    Pursuant to FRCP 38(b), Plaintiff demands a trial by jury in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

a.    A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned United States and Connecticut State laws; Preliminary and permanent injunctions against Defendant and its officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

b.    An award for all non-monetary and/or compensatory damages, including but not limited to, compensation for severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

c.    Punitive damages to the extent authorized by law in an amount commensurate with Defendant's ability and so as to deter future unlawful conduct;

d.    An order restraining Defendant from any further retaliation against Plaintiff for participation in any form in this litigation;

e.    All damages that Plaintiff has sustained as a result of the Defendant's conduct, including all unpaid wages and any shortfall between wages paid and those due under the law that Plaintiff would have received but for Defendant's unlawful payment practices;

33

f.    Liquidated damages and any other statutory penalties as recoverable under Connecticut's Wage Payment Law;

g.    Awarding Plaintiff his costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

h.    Pre-judgment and post-judgment interest, as provided by law; and

i.    Granting Plaintiff such other and further relief as this Court finds necessary and proper.

Respectfully submitted,

Jon L. Norinsberg
Madeline Howard
**JOSEPH & NORINSBERG, LLC**
110 East 59th Street, Suite 2300
New York, New York 10022
Tel.: (212) 227-5700
Fax: (212) 656-1889
jon@norinsberglaw.com
madeline@employeejustice.com

Mariusz Kurzyna (ct28940)
**ZIPIN, AMSTER & GREENBERG, LLC**
8757 Georgia Avenue, Suite 400
Silver Spring, MD 20910
Tel. 301-587-9373
Fax 240-839-9142
mkurzyna@zagfirm.com

*Counsel for Plaintiff*