**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| PETER MARTIN,<br>*Plaintiff*,<br><br>v.<br><br>GOOGLE LLC,<br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>) | 3:25-CV-587 (SVN)<br><br><br><br><br><br>November 13, 2026 |

**<u>RULING AND ORDER ON DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT IN PART</u>**

Sarala V. Nagala, United States District Judge.

Plaintiff Peter Martin brings this action against his former employer, Defendant Google, LLC ("Google"), alleging violations of the Americans with Disabilities Act ("ADA"), violations of the Connecticut Fair Employment Practices Act ("CFEPA"), violations of Sections 502 and 510 of the Employee Retirement Income Security Act ("ERISA"), a violation of Connecticut's Wage Payment Law, Conn. Gen. Stat. § 31-72, and common law claims for promissory estoppel, negligent misrepresentation, quantum meruit, breach of an implied-in-fact contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment.

Plaintiff, formerly a sales representative for Google, alleges that he was deprived of compensation he was owed in connection with his pursuit and consummation of a sales contract between Google and Otis Elevator. He contends that, after he disclosed to Google that he had been diagnosed with Stage 4 colon cancer and began receiving treatment, the terms of his oral agreement to receive the commissions from the Otis Elevator contract were not honored, and he was ultimately terminated in part to avoid payment of his ERISA-covered benefits. Google has filed a motion to dismiss Counts One, Two, and Five through Twelve of the Second Amended Complaint, with prejudice. For the reasons set forth below, the Court GRANTS Google's motion to dismiss in part, as to all claims except Plaintiff's ADA claims in Counts One and Two.

# I. FACTUAL AND PROCEDURAL BACKGROUND

A. The Second Amended Complaint

The following factual allegations, taken from Plaintiff's second amended complaint, are accepted as true for the purpose of this ruling. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*1. Plaintiff's Pursuit of the Otis Account & Related Compensation*

In July of 2020, Plaintiff began employment with Google as an Enterprise Field Sales Representative, which involved managing and expanding Google's engagement with strategic accounts. Second Am. Compl., ECF No. 67 ¶ 24. Plaintiff joined as a member of the expanding sales team for the Google Cloud division. *Id.* ¶ 25. Google Cloud sales representatives would sell to both new and existing customers, also known as "Greenfield" and "Spender" accounts, respectively. *Id.* ¶¶ 25–26. Plaintiff was assigned to the "New England" territory for Greenfield accounts, managed by Justin Srb. *Id.* ¶¶ 27–28. It is understood both in the technology sales field generally and at Google specifically that building Greenfield business is a time-intensive and expensive endeavor, *id.* ¶ 29, as evidenced by Plaintiff's assertion that virtually no members of his team landed any new business in the first year of his employment, *id.* ¶ 30.

In 2023, Google formally designated members of Plaintiff's sales team as Greenfield representatives, who exclusively sold to new accounts; Spender representatives, who serviced and upsold to existing accounts; or Hybrid representatives, who maintained both account types. *Id.* ¶¶ 32–34. A sales representative could service a Greenfield account despite being labelled a Spender representative, and vice versa. *Id.* ¶ 37. Different compensation plans applied to each category. *Id.* ¶ 35. Notably, the Greenfield compensation plan was substantially more lucrative than the other plans and provided financial incentives for securing new business. *Id.* ¶ 36.

By the time Google formally labelled Plaintiff as a Spender representative in 2023, Plaintiff had spent multiple years pursuing a Greenfield account: Otis Elevator. *Id.* ¶¶ 38–39. Plaintiff's

managers—Srb and Arun Parmar—expressly authorized Plaintiff's continued pursuit of the Otis account, including by promising that Plaintiff's compensation for the account would be governed by the Greenfield compensation plan. *Id.* ¶¶ 40–41, 50. At the same time, Plaintiff's management of Spender accounts would be governed by the Spender compensation plan. *Id.* ¶ 42. Plaintiff proposed to Srb that Plaintiff and Google enter into a written agreement setting forth the terms of Plaintiff's compensation for the Otis account, but Srb rejected that request without explanation. *Id.* ¶¶ 51–52. Relying on Parmar's and Srb's oral representation that his compensation for the Otis account would be governed by the Greenfield compensation plan, and at the urging and encouragement of Srb, Plaintiff undertook substantial effort over the course of three years in pursuit of the Otis account. *Id.* ¶¶ 44, 54. Indeed, Plaintiff declined opportunities to service or pursue other accounts that would have resulted in commissions, in favor of working on the Otis account. *Id.* ¶ 61.

On July 20, 2023, Plaintiff was diagnosed with Stage 4 Colon cancer, with an associated survival rate of less than 15%. *Id.* ¶¶ 45, 81, 85. Plaintiff immediately notified his supervisors, including Srb. *Id.* ¶¶ 45, 82. In August 2023, Plaintiff inquired with Parmar about the process for requesting reasonable accommodations for his cancer treatment. *Id.* ¶ 83. But while undergoing rigorous chemotherapy treatment, Plaintiff honored his professional commitments and did not miss a day of work due to treatment. *Id.* ¶ 84. According to Plaintiff, however, because he had "detailed discussions" with Srb and Parmar, Google knew or should have known that Plaintiff's diagnosis was likely terminal. *Id.* ¶ 86.

In December 2023, Plaintiff secured a $35 million contract for the Otis account, *id.* ¶¶ 46, 80, and Mr. Parmar praised Plaintiff for "pushing the right buttons to elevate Otis to the next level of its digital transformation journey," *id.* ¶ 47. But Google denied Plaintiff commissions on the

deal: Srb informed Plaintiff he would receive zero commissions for the Otis account. *Id.* ¶¶ 56–57, 88. Additionally, although the Otis deal was complete in December 2023, the sale appeared as "in pursuit" on Plaintiff's January 2024 performance review. *Id.* ¶ 80. When Plaintiff inquired about this, Srb stated that the performance reviews were done prior to finalizing the sale, but Plaintiff alleges that the deal's finalization was reflected on performance reviews for more than five other team members. *Id.*

Google publishes documents outlining commission structures for its field sales representatives. *Id.* ¶ 62. Plaintiff alleges he was promised compensation for the Otis account under one such plan entitled "Plan 1002 Details: FSR/CE Greenfield NAL," which—based on the Otis account's value—qualified him for the maximum 500% On Target Variable compensation cap in 2023 and likely for 2024. *Id.* ¶¶ 64–65. Due to multipliers that would have applied to the compensation, successful closure of the Otis account would have quintupled Plaintiff's compensation under this plan, qualifying him for $994,290 in total earnings in 2023. *Id.* ¶¶ 67–72. Further, Plaintiff would be separately entitled to approximately $1 million over the five-year life of the deal. *Id.* ¶ 73. All in all, Google deprived Plaintiff of at least $2 million in owed and earned commissions. *Id.* ¶ 74. Yet Google paid commission to two of Plaintiff's supervisors, and bonuses to one of Plaintiff's coworkers for their work on the Otis account, despite refusing to compensate Plaintiff according to the plan terms. *Id.* ¶¶ 78–79, 97.

*2. Alleged Adverse Actions, Including Termination*

Plaintiff alleges that a series of adverse actions against him began to occur in approximately January of 2024. That month, Plaintiff formally complained to Srb in writing, identifying the Otis account's impact on Google and that he was "struggling with his situation," i.e., Google's treatment of him. *Id.* ¶ 98. In early 2024, Google demoted Plaintiff, *id.* ¶ 104, reassigning Plaintiff's largest Spender accounts, along with his largest new target account, to other

representatives on the team, and assigning him to two smaller, non-enterprise Small and Medium Business accounts generating less than $200,000 in combined annual revenue. *Id.* ¶¶ 105–06. Additionally, after Plaintiff reported his cancer diagnosis, Google "baselessly" lowered Plaintiff's performance review rating from a 3 out of 5 ("Exceeds Expectation") in 2023 to a 2 out of 5 in 2024, and omitted any reference to Plaintiff's success in securing the Otis account. *Id.* ¶¶ 109–11. Plaintiff alleges that Google intentionally lowered Plaintiff's performance review to establish a basis for termination. *Id.* ¶ 111. Moreover, Google rescinded its promises of stock equity and a pay increase to Plaintiff following his cancer diagnosis, but extended such compensation to a colleague who received the same performance review rating but did not suffer with a disability or cancer diagnosis. *Id.* ¶¶ 114–15.

In May of 2024, Google terminated Plaintiff, effective July 28, 2024. *Id.* ¶ 120. Srb stated that the decision was tied to workforce reductions and was unrelated to Plaintiff's job performance. *Id.* ¶ 121. Plaintiff pushed back, emphasizing his successes and explaining his plan to attempt to double the Otis account value. *Id.* ¶ 122. Indeed, just minutes before the termination meeting, he had received a peer bonus in recognition for his work with Otis. *Id.* ¶ 123.

In July of 2024, Google sent Plaintiff an email stating that Plaintiff was "assigned to the territory Northeast 2 ENT Geo [] with the role of Enterprise FSR" and instructing him to check his book of business for the accounts assigned to him. *Id.* ¶ 124. Over the next several months, Plaintiff received multiple emails stating he had been assigned to other territories. *Id.* In light of these messages, Plaintiff believed he was no longer terminated, but repeatedly sought clarification from Google. *Id.* ¶ 125. Plaintiff received work emails through at least July 9, 2024. *Id.* ¶ 126. Otis staff members met with Google's leadership to voice concern and displeasure that Plaintiff would not be managing their account, explaining that it was his efforts that led them to sign with

Google. *Id.* ¶ 128. Google assured Otis that it had nothing to worry about, generating automated emails to Plaintiff to make it look as if he was not being terminated. *Id.* Ultimately, Google terminated Plaintiff's employment on July 31, 2024. *Id.* ¶ 129.

*3. Plaintiff's Life Insurance*

During Plaintiff's employment, he was a plan participant in Google's life insurance plan, which provided that if Plaintiff were to die during employment, his spouse was entitled to receive a $2 million death benefit, plus 50% of Plaintiff's annual earnings for ten years following his death. *Id.* ¶¶ 134–35. Plaintiff alleges that the temporal proximity between his cancer diagnosis disclosure and Google's escalating adverse actions—combined with the magnitude of the financial exposure created by his diagnosis—supports the reasonable inference that Google's decision to terminate Plaintiff was motivated by a specific desire to eliminate near-certain liability under Plaintiff's ERISA-covered life insurance plan. *Id.* ¶¶ 138–46.

B. Procedural History

Plaintiff commenced this action on April 14, 2025. Compl., ECF No. 1. Following Google's initial motion to dismiss, Plaintiff filed an amended complaint, which Google moved to dismiss in full, Mot. to Dismiss. ECF No. 36. The Court granted the motion to dismiss, but afforded Plaintiff leave to amend. Order, ECF No. 64; *Martin v. Google LLC*, No. 3:25-CV-587 (SVN), 2026 WL 657265, at *1 (D. Conn. Mar. 9, 2026) ("*Martin I*"). Plaintiff then filed a second amended complaint ("SAC"), ECF No. 67, which brings twelve counts: (1) disability discrimination in violation of the ADA; (2) retaliation in violation of the ADA; (3) discrimination in violation of the CFEPA; (4) retaliation in violation of the CFEPA; (5) violations of the Employee Retirement Income Security Act ("ERISA"); (6) violation of Connecticut's wage payment law; (7) promissory estoppel; (8) negligent misrepresentation; (9) quantum meruit; (10) breach of implied-in-fact contract; (11) breach of implied covenant of good faith and fair dealing; and (12) unjust

enrichment. Google now moves to dismiss Counts One, Two, and Five through Twelve. ECF No. 72. Plaintiff opposes the motion to dismiss. Pl.'s Opp. Br., ECF No. 73.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a case or cause of action for failure to state a claim upon which relief can be granted. When determining whether a complaint states a claim upon which relief can be granted, highly detailed allegations are not required, but the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. This plausibility standard is not a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Id.* In undertaking this analysis, the Court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted).

The Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008), and "a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Ultimately, determining whether a complaint states a plausible claim for relief

is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III. DISCUSSION

### A. Counts One and Two (ADA Claims)

First, the Court denies Google's motion to dismiss Counts One and Two of the SAC alleging claims under the ADA, which argues that Plaintiff failed to timely file a charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC").

Plaintiffs must exhaust their administrative remedies before suing a private employer in federal court under the ADA. *Soules v. Conn., Dep't of Emergency Servs. and Public Protection*, 882 F.3d 52, 57 (2d Cir. 2018). To do so, an individual generally must (1) file a timely charge with the EEOC and (2) receive a right-to-sue letter from the EEOC. 42 U.S.C. § 12117(a) (incorporating Title VII procedures for ADA claims); 42 U.S.C. §§ 2000e-5(b), (e), (f). A charge is timely made within 180 days of the alleged discriminatory act, unless Plaintiff files a charge with a state agency, in which case the time limit is 300 days. 42 U.S.C. § 2000e-5(e)(1) (Title VII); *V.W. v. Yale Univ.*, No. 3:22-CV-01156 (KAD), 2024 WL 4349032, at *4 (D. Conn. Sept. 30, 2024) ("In states with their own anti-discrimination laws and agencies, like Connecticut, the time period to file the complaint with the EEOC extends from 180 days to 300 days where there is proof that the complaint was first submitted to the state agency.").

The Court concludes that Plaintiff timely filed his EEOC claim.[1] The relevant timeline is as follows. Plaintiff received notice from Srb on May 29, 2024, that he would be terminated effective July 28, 2024. ECF No. 67 ¶ 120. Three hundred days from May 29, 2024, was March

[1] Although the parties do not discuss whether or when Plaintiff submitted a charge to the Connecticut Commission on Human Rights and Opportunities, they appear to agree that the 300-day deadline governs. Accordingly, the Court examines whether the 300-day deadline was met. *See* ECF No. 72-1 at 14 (discussing 300-day deadline); ECF No. 73 at 14 (same).

25, 2025, while three hundred days from July 28, 2024, was May 24, 2025. On April 3, 2025, Plaintiff filed his EEOC charge, which notes that the date the discrimination took place was July 31, 2024. Debashi Decl. Ex. A., ECF No. 72-5 at 2. Citing to caselaw providing that the 300-day period commences "when the employee receives a definite notice of the termination, not upon his discharge," Google contends that the limitation-triggering date is May 29, 2024, because that is when Plaintiff was first notified of his termination. ECF No. 72-1 at 11 (citing ECF No. 67 ¶¶ 120, 130[2]); *Armstead v. Stop & Shop Companies, Inc.*, No. 3:01-CV-1489 (JBA), 2002 WL 770732, at *4 (D. Conn. Apr. 19, 2002) (quoting *Miller v. International Tel. & Tel. Corp.*, 755 F.2d 20, 23 (2d Cir.1985)); *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980). But the SAC's allegations support a plausible inference that the May 29 termination meeting was not a definite notice of Plaintiff's termination.

Plaintiff alleges that he received several emails from Google assigning him to certain sales territories in July of 2024, which lead him to believe "that he was no longer terminated," and prompted him to "repeatedly seek clarification from Defendant to confirm whether or not he was still going to be employed." ECF No. 67 ¶¶ 124–25. Moreover, Plaintiff alleges that Google "generated automated emails to Plaintiff that made it appear as though he was not being terminated after all." *Id.* ¶ 128. Although it is true that Google never officially rescinded the termination notice, these emails conveyed mixed messages to Plaintiff about whether his termination would truly be effective on July 28, 2024; thus, the Plaintiff plausibly alleges that the May 29 termination notice was not "definite." Moreover, Plaintiff alleges that his termination on July 31, 2024, was "a final discriminatory step as a result of Plaintiff's cancer diagnosis." *Id.* ¶ 130. Therefore, unlike

[2] The Court notes that Google's attempt to tie the May 29, 2024, date referenced in paragraph 120 of the SAC to the statement in paragraph 130 of the SAC that it "terminated Plaintiff's employment in a final discriminatory step" is a nonintuitive reading of the complaint, given that the preceding paragraph, paragraph 129, refers to July 31, 2024, as the termination date. ECF No. 67 ¶¶ 120, 129–30.

in *Ricks*, where termination one year after a denial of tenure was standard practice and was not alleged to be separately discriminatory, here Plaintiff contends that the termination on July 31, 2024, was a distinct, final discriminatory act. *Cf. Ricks*, 449 U.S. at 258 ("[T]he only alleged discrimination occurred—and the filing limitations period therefore commenced—at the time the tenure decision was made and communicated to Ricks."). Accordingly, the SAC's allegations give rise to the plausible inference that a discriminatory act—termination—occurred on July 31, 2024, and that Plaintiff's EEOC charge filing was therefore timely.[3]

Because the Court reaches this conclusion on the face of the SAC, it need not consider Plaintiff's Exhibit A, his termination notice, which Google argues the Court should not consider. Likewise, the Court need not address the parties' arguments as to the continuing violation theory at this juncture, given its holding on timeliness.

In sum, the Court denies Google's motion to dismiss Counts One and Two.

B. Count Five (ERISA Violations)

Second, the Court finds that Plaintiff fails to state an ERISA claim.

*1. Section 502*

ERISA Section 502(a)(1)(B) authorizes the participant in an employee benefit plan to sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ." 29 U.S.C. § 1132(a)(1)(B). Intuitively, a plaintiff must allege that he is entitled to benefits under the terms of the plan in order to state a plausible claim for a denial of benefits under Section 502(a)(1)(B). *See, e.g.*, *Burns v. Marley Co. Pension Plan for Hourly Emps. at Stockton, Cal.*, No. 08-CV-3763

[3] If Google believes there are no genuine disputes of material fact about the definiteness of the termination notice, it may reassert its argument that Plaintiff received definite notice of termination on an earlier date at the summary judgment stage. *See Armstead*, 2002 WL 770732, at *2–3 (D. Conn. Apr. 19, 2002) (determining issue of whether notice of termination was definite using a summary judgment standard).

(CPS), 2009 WL 1193474, at *4 (E.D.N.Y. Apr. 30, 2009) ("[P]laintiff has failed to allege that he is entitled to benefits 'under the terms of the plan,' as Section 502(a)(1)(B) of ERISA requires.").

The Court concludes that the SAC does not allege that Plaintiff was entitled to life insurance benefits under the terms of the plan, because such benefits would not have vested until his death, and therefore that he fails to state a claim under ERISA Section 502(a)(1)(B). Plaintiff alleges that "[u]nder the terms of his policy, if Plaintiff were to die during his employment, his spouse would be entitled to receive" significant benefits. ECF No. 67 ¶ 191; *see also id.* ¶ 134. Plaintiff further alleges that because Google "fail[ed] to pay Plaintiff any vested percentage of his benefits upon termination of employment," he is entitled to equitable remedies including reinstatement of benefits, restitution, disgorgement, and attorneys' fees. *Id.* ¶¶ 194, 196. But the SAC's allegations do not provide a factual basis to support an inference that Plaintiff was entitled to some "vested percentage" of his life insurance benefits. Indeed, the SAC itself notes that benefit entitlement under the policy is triggered by Plaintiff's death. *Id.* ¶¶ 134, 191. Because Plaintiff fails to allege that he was entitled to benefits under the terms of the plan, he fails to state a claim under Section 502(a)(1)(B).

Plaintiff's contention in his briefing that his claim is not "a demand for a death benefit by a living plaintiff," but rather a claim for "interference with the right to maintain coverage" because his life insurance was terminated concurrently with his employment, is unsupportable. ECF No. 73 at 18. Plaintiff does not cite to any authority recognizing a comparable claim for "interference with the right to maintain coverage" under ERISA Section 502(a)(1)(B). The sole authority Plaintiff cites, *Sullivan-Mestecky v. Verizon Communications Inc.*, 961 F.3d 91, 97 (2d Cir. 2020), concerns a plaintiff disputing non-payment of benefits as the beneficiary of her mother's life insurance policy *after* her mother passed away. Nevertheless, Plaintiff argues that this case

bolsters his ERISA claim under Section 502 because the Second Circuit concluded that "the beneficiary stated a claim for wrongful denial where participant relied on promise to maintain coverage and forewent alternative life insurance," ECF No. 73 at 19. Plaintiff is inaccurate. The Second Circuit affirmed the district court's grant of summary judgment as to plaintiff's Section 502(a)(1)(B) claim because "the generous benefits [plaintiff sought] never vested under the terms of the plan." *Sullivan-Mestecky*, 961 F.3d 91 at 98. Because Plaintiff fails to provide the Court with authority supporting his theory of a ERISA Section 502(a)(1)(B) claim—without any actual denial of benefits—the Court concludes that Plaintiff fails to state a Section 502(a)(1)(B) claim.[4]

*2. Section 510*

Section 510 of ERISA provides that "[i]t shall be unlawful for any person to discharge . . . a participant or beneficiary [of an employee benefit plan] . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . ." 29 U.S.C. § 1140. "Section 510 was designed primarily to prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *Dister v. The Cont'l Grp, Inc.*, 859 F.2d 1108, 1111 (2d Cir. 1988) (internal citation omitted). "An essential element of plaintiff's proof under [§ 510 of ERISA] is to show that an employer was at least in part motivated by the specific intent to engage in activity prohibited by § 510." *Id.* (string citation omitted). Thus, a plaintiff will not be able to pursue a Section 510 claim if "the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment." *Id.* "This standard does not require the plaintiff to show that interference with ERISA rights was the sole reason for his discharge, but it does require him to show more than the incidental loss of benefits as a result of a discharge." *Gandelman v. Aetna*

[4] Additionally, Plaintiff's counsel conceded this point during oral argument, and stated that Plaintiff is pursuing only an ERISA Section 510 claim.

*Ambulance Serv., Inc.*, 48 F. Supp. 2d 169, 172 (D. Conn. 1999) (citing *Seaman v. Arvida Realty Sales*, 985 F.2d 543, 546 (11th Cir. 1993)).

As the Court observed in its decision on Google's first motion to dismiss, "a plaintiff is not required to plead a *prima facie* case under *McDonnell Douglas*, at least as the test was originally formulated, to defeat a motion to dismiss" in this context. *Martin I*, 2026 WL 657265 at *4 n.2 (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015)). Rather, because "a temporary presumption of discriminatory motivation is created under the first prong of the *McDonnell Douglas* analysis, a plaintiff need only give plausible support to a minimal inference of discriminatory motivation." *Vega*, 801 F.3d 72 at 84 (cleaned up).

The Court concludes that the SAC does not allege facts in support of a "minimal inference" of discriminatory motivation with respect to Plaintiff's life insurance benefits. First, the SAC insufficiently alleges that Google appreciated the severity of Plaintiff's diagnosis. Although Plaintiff states that he disclosed his Stage 4 colon cancer diagnosis to his supervisors (Srb and Parmar) in July of 2023 and that he inquired about the accommodations process with respect to treatment, ECF No. 67 ¶¶ 83, 85–86, he also alleges that he "consistently honored all his professional commitments, and never missed a day of work due to his treatment," *id.* ¶ 84—thereby undermining an inference that Google knew the severity of his diagnosis. Indeed, the SAC does not allege that Plaintiff told his supervisors about the 15% survival rate for his condition—only that they "knew or should have known" it based on his discussions with them. *Id.* ¶ 86. Plaintiff fails to explain how the possibility of having to pay Plaintiff's life insurance benefits could be a motivating factor in in his termination, if Google only *should have known* of the low survival rate, and may not have *actually know* about it. And Plaintiff's allegation that Google actually knew of

the 15% survival rate is conclusory, and unsupported by factual allegations establishing such knowledge.

Moreover, although the SAC provides that Plaintiff's life insurance policy would provide generous benefits to his spouse (to the tune of nearly $4 million), *id.* ¶ 135, the SAC does not plausibly allege facts to support the idea that Google was even in part motivated to terminate him based on his potential eligibility for the life insurance payout. While Plaintiff argues that the timing of his termination supports the plausibility of his claim, any causal connection is undercut by the fact that Plaintiff was terminated a full year after disclosure of his diagnosis and after he continuously attended work despite his treatments. *See id.* ¶¶ 81-82 (noting disclosure in July 2023); *id.* ¶ 129 (noting termination of employment in July 2024).[5] As with his amended complaint, Plaintiff's allegations in the SAC suggest that benefits under the life insurance policy did not vest because of his alleged wrongful termination, but fail to plausibly allege that Google intended to unlawfully prevent payment of those benefits by terminating him. *See Jiggetts v. United Parcel Serv.*, No. 14-CV-8291 (AJN), 2017 WL 1164698, at *7 (S.D.N.Y. Mar. 27, 2017) ("Although the *effect* of a wrongful termination on the basis of a protected characteristic such as [a disability] may be that certain [] benefits do not vest, such termination does not state a claim under ERISA unless it is motivated by a desire to unlawfully prevent those benefits from vesting."). Plaintiff alleges only that the unavailability of benefits was a consequence of his termination—not a motivating factor behind it.

In sum, Plaintiff fails to state a claim under either Section 502 or Section 510 of ERISA.

---

[5] *Russell v. Northrop Grumman Corporation,* 921 F. Supp. 143, 149 (E.D.N.Y. 1996), is not on point. There, the plaintiff was terminated just seven months prior to accruing the relevant benefit after working for defendant for more than nineteen years. Here, Plaintiff cannot allege that his termination bore any particular relation to a vesting date, which is not fixed.

C. Count Seven (Promissory Estoppel)

Third, Plaintiff fails to state a common law claim for promissory estoppel.

*1. Clear and Definite Promise*

Under the doctrine of promissory estoppel, "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Torringford Farms Ass'n, Inc. v. City of Torrington*, 75 Conn. App. 570, 575 (2003). "A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance." *Id.* "[T]he promise must reflect a present intent to commit as distinguished from a mere statement of intent to contract in the future . . . . The requirements of clarity and definiteness are the determinative factors in deciding whether the statements are indeed expressions of commitment as opposed to expressions of intention, hope, desire or opinion." *Stewart v. Cendant Mobility Servs. Corp.*, 267 Conn. 96, 105 (2003).

The Court concludes that the SAC plausibly alleges a clear and definite promise, specifically that "Mr. Parmar and Mr. Srb promised and represented to Plaintiff that his pursuit of, and ultimate compensation for, the Otis Account would be governed by the lucrative Greenfield compensation plan." ECF No. 67 ¶ 41. Although the SAC also alleges that Srb rejected Plaintiff's request to formalize this agreement in writing, *id.* ¶¶ 52–53, this fact does not tend to undermine the clarity of the alleged oral promise that Plaintiff's work on the Otis account would be compensated under a particular plan. This case thus differs from *Abira Medical Laboratories, LLC v. Anthem Blue Cross Blue Shield of Connecticut*, No. 3:24-CV-00872 (SVN), 2025 WL 1825425, at *14 (D. Conn. July 2, 2025), where the complaint did not illuminate "what Defendant's representation or promise was."

*2. Parol Evidence*

Although the SAC articulates a clear promise made by Parmar and Srb, Plaintiff's promissory estoppel claim nevertheless fails because the Court cannot consider the alleged oral promise. "Promissory estoppel, though a cause of action 'off the contract,' and thus, available to enforce promises outside the scope of a valid contract, may not be used to create obligations that contradict those explicitly set forth in a written agreement." *Hood v. Aerotek, Inc.*, 3:98-CV-1524 (CFD), 2002 WL 294762, at *5 (D. Conn. Feb. 19, 2002). The parol evidence is not a rule of evidence, but a "substantive rule of contract law." *Id.* (citing cases). "The rule is premised upon the idea that 'when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages [etc.], in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme." *Id.* (quoting *Tallmadge Bros, Inc. v. Iroquois Gas Transmission System L.P.*, 252 Conn. 479, 502 (2000)). Thus, the parol evidence rule forbids consideration of verbal statements "outside the four corners of the contract" to "vary or contradict the terms of an integrated contract." *Farzan v. Bridgewater Assocs.*, No. 16-CV-935 (SRU), 2017 WL 354685, *12 (D. Conn. Jan. 24, 2017), *aff'd* 699 F. App'x 57 (2d Cir 2017) (cleaned up; citing *Schilberg Integrated Metals v. Cont'l Cas. Co.*, 263 Conn. 245, 277 (2003)). "Allowing promissory estoppel when the alleged promise contradicts a promise located in an integrated agreement would provide an end-run around the parol evidence rule." *Hood*, 2002 WL 294762, at *5.

Plaintiff argues that the promise with respect to the Otis arrangement was a collateral oral arrangement that did not vary the terms of the written agreement between the parties. ECF No. 73

at 24–25. It is true that parol evidence may be admissible to "prove a collateral oral agreement which does not vary the terms of the writing." *TIE Commc'ns, Inc. v. Kopp*, 218 Conn. 281, 289 (1991) (citation omitted). To determine whether an agreement is collateral, the Court must examine whether "'the particular element of the alleged extrinsic [agreement] is dealt with at all in the [integrated] writing. If it is mentioned, covered, or dealt with in [that] writing, then presumably the writing was meant to represent all of the transactions on that element; if it is not, then probably the writing was not intended to embody that element of the negotiation.'" *Perricone v. Perricone*, 292 Conn. 187, 195–96 (2009) (quoting *Shelton Yacht & Cabana Club, Inc. v. Suto*, 150 Conn. 251, 258 (1963)).

Here, Srb's oral promise does not constitute a collateral agreement for two reasons. First, the SAC frames the oral agreement as a variance from the Spender plan that governed his compensation. *See* ECF No. 67 ¶ 40 (Plaintiff was labeled a "Spender account sales representative" but was "authorized to continue pursuing the Otis Account"); *id.* ¶ 93 (Srb told Plaintiff that Google "granted [Plaintiff] a limited 'exception' from his Spender status to allow him to sell the Otis Account, but that 'exception' did not allow him to be paid or receive compensation for the Otis Account pursuant to the Greenfield compensation plan."); *id.* ¶ 43 (acknowledging that "permitting Plaintiff to pursue the Otis Account was a change in the primary duties of a Spender account sales representative . . . "); *id.* ¶ 49 (Plaintiff "was labelled as a Spender sales representative and, therefore, his job duties were to service existing business.").

Second, the written Spender plan clearly addresses the matter of Plaintiff's compensation for his sales work in 2023. *See* 2023 Cloud General Incentive Compensation Terms & Conditions, ECF No. 36-4 at 2–4. Thus, the written agreement is presumed to "represent all of the transactions on that element." *Perricone*, 282 Conn. at 196 (citation omitted). This reading of the Spender

plan as a fully integrated agreement is bolstered by the Spender plan's reference to the "2023 Cloud General Incentive Compensation Terms & Conditions" document.[6] The Terms & Conditions document clearly states that it "supersedes all other sales compensation policies or guidelines, unless otherwise stated," and that "[i]f there are any conflicting policy statements or communications from anyone at the Company including the Seller's manager, this policy shall take precedence." Peltier Decl., Ex. A, ECF No. 72-3 at 4.

Moreover, Plaintiff does not argue in his papers that the Spender plan was not fully integrated. At oral argument, Plaintiff's counsel argued that *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 21 (2d Cir. 1997), stands for the proposition that, when a plaintiff alleges a misrepresentation, that misrepresentation is not excluded by the parol evidence rule even in the face of an apparently integrated contract. But Plaintiff overreads *Tempo*, which instead holds that the parol evidence rule "does not exclude evidence [of misrepresentation] to show that there was no agreement or that the agreement was invalid." *Tempo*, 120 F.3d at 21. Here, Plaintiff does not contend that Google made any misrepresentation that resulted in his agreeing to the Spender Plan or its Terms & Conditions. Thus, *Tempo* is inapposite, and provides no insight for the Court's decision in this case.

The Court therefore concludes that the parol evidence rule applies with equal force to preclude Plaintiff's promissory estoppel claim in the SAC as it did to preclude the amended complaint's breach of contract claim and, as a result, the Court grants Google's motion to dismiss Count Seven.

---

[6] Plaintiff does not object to the Court's consideration of the Terms & Conditions document. *See* ECF No. 73 at 26 (discussing that document, without objection to it being evaluated in deciding the motion to dismiss).

D. Counts Ten, Eleven, and Six (Breach of Implied-In-Fact Contract; Breach of Implied Covenant of Good Faith and Fair Dealing; Violation of Connecticut's Wage Payment Law)

Fourth, the Court finds that Plaintiff fails to plausibly allege an implied-in-fact contract, which also results in dismissal of Plaintiff's claim for breach of the implied covenant of good faith and fair dealing and Plaintiff's claim under Conn. Gen. Stat. § 31-72.

An implied-in-fact contract is assented to by implication from the parties' conduct. *Ultimate Nutrition, Inc. v. Leprino Foods Co.*, 747 F. Supp. 3d 371, 381 (D. Conn. 2024) (citing *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557 (2006)). But a "contract cannot be implied in fact where there is an express contract covering the subject matter involved." *Giardina v. Washington Mut. Bank, FA*, No. 07-CV-1466 (SJF/MLO), 2008 WL 11448020, at *4 (E.D.N.Y. July 15, 2008) (citations omitted); *Meaney v. Conn. Hosp. Ass'n, Inc.*, 250 Conn. 500, 517–18 (1999) (citing treatise explaining that "an express contract between the parties precludes recognition of an implied-in-law contract governing the same subject matter" and collecting cases). As discussed above, Plaintiff's Spender contract—as interpreted alongside the 2023 Cloud General Incentive Compensation Terms & Conditions, clarify that those documents cover the subject matter of Plaintiff's compensation during the relevant time period, and thus no other contract—including that Plaintiff would be compensated pursuant to the Greenfield plan for the Otis deal—can be implied by the parties' conduct. And because there is a written agreement between the parties, the parol evidence rule likewise bars consideration of the alleged oral promise. *See Hood*, 2002 WL 294762, at *5; *Giardina*, 2008 WL 11448020, at *4.

In any event, Plaintiff fails to allege that the parties' conduct gives rise to an implied contract. Although Google permitted Plaintiff to service a Greenfield account, the SAC contemplates this as a familiar practice, noting that "[a] sales representative may service a Greenfield account despite being labelled a Spender account sales representative, and vice versa."

ECF No. 67 ¶ 37. The SAC does not allege facts tending to show that this practice led to an implied agreement to deviate from the terms of the associated sales representative's compensation plan. And although Plaintiff argues that Google compensated other employees for the Otis account deal pursuant to the Greenfield terms, Plaintiff does not allege which compensation plans governed those employees. *See* ECF No. 67 ¶¶ 78–79. Because Plaintiff's compensation was governed by an express contract and Plaintiff has not plausibly alleged an implied-in-fact contract, this claim fails.

And because Plaintiff has failed to plausibly allege that a contract existed between the parties with respect to paying him under the Greenfield plan for the Otis deal, Plaintiff's claim for breach of an implied covenant of good faith and fair dealing also fails. "[E]very contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 794 (2013) (citation omitted). But "the existence of a contract between the parties is a necessary antecedent to any claim of breach of the duty of good faith and fair dealing." *Hoskins v. Titan Value Equities Grp., Inc.*, 252 Conn. 789, 793 (2000); *see also Valls v. Allstate Ins. Co.*, No. 3:16-CV-01310 (VAB), 2017 WL 4286301, at *5 (D. Conn. Sept. 27, 2017) ("Because Plaintiffs have not plead a plausible claim for breach of contract, their claim for breach of the implied covenant of good faith and fair dealing also fails."), *aff'd*, 919 F.3d 739 (2d Cir. 2019).

Lastly, Connecticut's wage law provides a private right of action when "any employer fails to pay an employee wages" under an employer-employee contract. Conn. Gen. Stat. § 31-72; *Connecticut v. YP Advert. & Publ'g LLC*, No. 3:16-CV-1424 (MPS), 2017 WL 810279, at *7 (D. Conn. Mar. 1, 2017). "[T]he Connecticut Supreme Court has repeatedly held that Section 31-72 merely provides a remedy for violations of an existing wage agreement, and confers no rights

above and beyond the agreement." *Id.* (citing *Geysen v. Securitas Sec. Svcs. USA, Inc.*, 322 Conn. 385, 393–94 (2016)). Because the Court concludes that Plaintiff's claim for commissions is not supported by an agreement between the parties, this claim also fails. Plaintiff's sole authority in support of his wage law claim is not on point. *See* ECF No. 73 at 29 (citing *Quiello v. Reward Network Establishment Servs., Inc.,* 420 F. Supp. 2d 23, 35 (D. Conn. 2006), *adhered to on reconsideration*, No. 3:04-CV-2141 (JCH), 2006 WL 1359329 (D. Conn. May 17, 2006)). In *Quiello*, the plaintiff argued that deductions made from his commissions "exceeded what was authorized *by the language in those plans*." 420 F. Supp. 2d at 35 (emphasis added). In this case, Plaintiff does not have an agreement in which he may root his Connecticut wage claim.

As the Court concludes that Plaintiff's implied-in-fact contract claim fails, his breach of the implied covenant of good faith and fair dealing and state wage law claim suffer the same fate. The Court therefore grants Google's motion to dismiss Counts Ten, Eleven, and Six.

E. Counts Nine and Twelve (Quantum Meruit; Unjust Enrichment)

Fifth, Plaintiff's quantum meruit and unjust enrichment claims also fail.

Quantium meruit and unjustment enrichment are "allied common-law principles," but "are not simply different terms with an identical meaning." *Parnoff v. Yuille*, 139 Conn. App. 147, 154 n.7 (2012). "While unjust enrichment focuses on the propriety of a payee or beneficiary retaining funds or a benefit, quantum meruit's primary focus is on the value of services rendered." *Id.* To recover for unjust enrichment, a plaintiff must plausibly plead: "(1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Culver v. Culver*, 127 Conn. App. 236, 249 (2011). To state a claim for quantum meruit, the plaintiff must allege that "the defendant, by knowingly accepting the services of the plaintiff and representing to her that she would be compensated in the future, impliedly promised to pay her for the services rendered." *Total*

*Aircraft, LLC v. Nascimento*, 93 Conn. App. 576, 582 n.5 (2006). Quantum meruit is the remedy available on an implied contract. *Id.* (citation omitted). Here, Plaintiff pleads these claims in the alternative to his claims alleging the existence of an enforceable contract. *See, e.g.*, *Metzner v. Quinnipiac Univ.*, 528 F. Supp. 3d 15, 34 (D. Conn. 2021) (recognizing that an unjust enrichment claim may be pleaded in the alternative to enforcement of an enforceable contract).

But Plaintiff's unjust enrichment and quantum meruit claims fail because there was an enforceable contract between the parties. "Proof of a contract enforceable at law precludes the equitable remedy of unjust enrichment." *Lieberman v. Emigrant Mortg. Co.*, 436 F. Supp. 2d 357, 366 (D. Conn. 2006) ("Parties who have entered into controlling express contracts are bound by such contracts to the exclusion of inconsistent implied contract obligations.") (quoting *Polverari v. Peatt*, 29 Conn. App. 191, 199 (1992)). Put another way, "[t]he quasi-contractual remedy of unjust enrichment is only available when no express contractual obligation exists." *All. Grp. Servs., Inc. v. Grassi & Co.*, 406 F. Supp. 2d 157, 166 (D. Conn. 2005) (citation omitted). Likewise, "[s]imilar to claim of unjust enrichment, a claim based on a theory of quantum meruit and a claim of breach of contract are mutually exclusive; quantum meruit presumes the lack of an enforceable contract governing the situation being litigated." *HMN Holdco, LLC v. MajorMedia,* LLC, No. FST-CV-206048210-S, 2022 WL 1135437, at *1 (Conn. Sup. Ct. Apr. 5, 2022) (citing *Meribear Productions, Inc. v. Frank*, 328 Conn. 709, 724 (2018)).

As the Court has already concluded that there was an integrated written contract governing Plaintiff's compensation—the Spender plan and its associated Terms & Conditions—allowing Plaintiff to proceed on claims for unjust enrichment or quantum meruit to recover compensation under the Greenfield plan for his work on the Otis deal would be inconsistent with the agreement. *See All. Grp. Servs., Inc.*, 406 F. Supp. 2d at 166 (granting motion for summary judgment on an

unjust enrichment claim where there was a valid and enforceable agreement between the parties). Although it is true that unjust enrichment and quantum meruit claims may be pleaded in the alternative to a contractual claim when there is a genuine dispute about whether there is an enforceable oral contract—and Plaintiff claims there is such a dispute based on Srb's alleged promises to him—the Court has held above that the parol evidence rule precludes consideration of an such oral promise. Thus, there is only one written, enforceable contract, and Plaintiff cannot pursue his unjust enrichment or quantum meruit claims, even in the alternative.

F. <u>Count Eight (Negligent Misrepresentation)</u>

Sixth, the Court concludes that Plaintiff fails to allege a claim for negligent misrepresentation.

To state a claim for negligent misrepresentation under Connecticut law, a plaintiff must allege: (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result. *See Stuart v. Freiberg*, 316 Conn. 809, 822 (2015) (citation omitted). Here, Plaintiff alleges that Google "knew at the time it promised Greenfield compensation to Plaintiff to pursue the Otis Elevator deal that it had no intention of paying Plaintiff the commissions he would earn under the Greenfield compensation plan." ECF No. 67 ¶ 59; *see also id.* ¶ 214 ("Defendant, through Mr. Parmar and Mr. Srb, made representations to Plaintiff . . . in which Defendant knew or, in the exercise of reasonable care, should have known that such representations were false and misleading."). But "Plaintiff offers few, if any, allegations to make plausible the proposition that Defendant knew or should have known such a promise . . . was false." *Abira Med. Lab'ys, LLC*, 2025 WL 1825425, at *13. Contrary to Plaintiff's argument, the SAC lacks allegations for the Court to infer that Srb had "specialized knowledge of Google's compensation structure" by virtue of his position. *See* ECF No. 73 at 31. Moreover, the fact that

Srb received revenue credit for the deal does not bear on his alleged statement made long before distribution of such income. *See id.*; ECF No. 67 ¶¶ 93, 97. Finally, in the absence of Plaintiff citing any authority to support the proposition that Srb's denial of Plaintiff's request to put the alleged promise in writing gives rise to the plausible inference that he knew the promise was false, the Court cannot find that this allegation supports a negligent misrepresentation claim.

Thus, Plaintiff fails to state a negligent representation claim, and the Court grants Defendant's motion to dismiss Count Eight.

G. <u>Leave to Amend</u>

Finally, Plaintiff requests leave to amend as to any dismissed count. ECF No. 73 at 32–33. Leave to amend pleadings should be "freely given . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). "However, where a Plaintiff has already 'been given ample prior opportunity to allege a claim,' denial of leave to amend again is appropriate." *Karazin v. Wright Med. Tech., Inc.*, No. 3:17CV823 (JBA), 2018 WL 6067235, at *1 (D. Conn. Nov. 19, 2018) (quoting *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 72 (2d Cir. 1996)).

Plaintiff has already had two chances to amend to state plausible claims (through the first amended complaint and the SAC). The Court exercises its discretion not to allow further amendment, especially as Plaintiff has not specifically explained how he would amend his complaint in light of discovery. *See Sutton ex rel. Rose v. Wachovia Sec., LLC*, 208 F. App'x 27, 29 (2d Cir. 2006) (summary order).

## IV. CONCLUSION

For the reasons described herein, Defendant's motion to dismiss is GRANTED as to Counts Five through Twelve and DENIED as to Counts One and Two. Defendant shall file its answer to the SAC by November 30, 2026. The deadline to complete discovery is December 30, 2026.

Any motions related to preclusion of experts or for summary judgment are due January 29, 2027.

**SO ORDERED** at Hartford, Connecticut, this 13th day of November, 2026.

*/s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE